Michael Jordan v.                                          Michael Jordan
Wayne County, Mississippi, et al.                         February 17, 2017

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

MICHAEL JORDAN                                              PLAINTIFF

V.                              CIVIL ACTION NO. 2:16-CV-70-KS-MTP

WAYNE COUNTY, MISSISSIPPI AND
SHERIFF JODY ASHLEY IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY                                      DEFENDANTS

### ORAL DEPOSITION OF MICHAEL JORDAN

Taken at the instance of the Defendants on Friday,
February 17, 2017, in the Wayne County Sheriff's
Department, 613 Court Street, Waynesboro, Mississippi,
beginning at 9:15 a.m.

(Appearances noted herein)



EXHIBIT
A

REPORTED BY:       Kelly D. Brentz, CSR, RPR
                   Edwards Reporting, Inc.
                   435 Katherine Drive, Suite A
                   Jackson, Mississippi 39232
                   601-355-DEPO (3376)
                   800-705-DEPO (3376)

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

**Page 2**

```
 1                    APPEARANCES:
 2
 3
 4        DANIEL M. WAIDE, ESQ.
          Johnson, Ratliff & Waide, PLLC
 5        1300 Hardy Street
          Hattiesburg, Mississippi 39401
 6
 7                COUNSEL FOR PLAINTIFF
 8
 9
10
11        WILLIAM R. ALLEN, ESQ.
          Allen, Allen, Breeland & Allen, PLLC
12        214 Justice Street
          Brookhaven, Mississippi 39602
13
                  COUNSEL FOR DEFENDANTS
14
15
16
17
18
19   ALSO PRESENT:  Tommy Jackson
                    Sheriff Jody Ashley
20
21
22
23
24
25
```

**Page 3**

```
 1                     INDEX
 2   Style and Appearances.............................. 1
 3   Index.............................................. 3
 4   Examination by Mr. Allen........................... 4
 5        Exhibit 1..................................... 36
 6        Exhibit 2..................................... 99
 7   Certificate of Deponent............................100
 8   Certificate of Reporter............................101
```

**Page 4**

1   MR. ALLEN:  Usual stipulations for us?
2   MR. WAIDE:  Oh, yes.
3          MICHAEL JORDAN,
4   having first been duly sworn, was examined and
5   testified as follows, to-wit:
6   EXAMINATION BY MR. ALLEN:
7   Q.   Would you state your name for the record?
8   A.   Michael Ladale Jordan.
9   Q.   Mr. Jordan, we met a minute ago, but my name is
10  Will Allen.  And I represent Sheriff Ashley and Wayne
11  County in the case that you have brought.  We're here for
12  your deposition.  Have you ever done this before?
13  A.   I have done it with my attorney.
14  Q.   Okay.  In another case or --
15  A.   No, not a case, just --
16  Q.   He's prepared you?
17  A.   Yes.
18  Q.   Okay.  All right.  So you know what's going to
19  happen here?
20  A.   Yes.
21  Q.   All right.  Let me just kind of tell you what I
22  always tell people, and Daniel and I have done this a lot
23  together so I know he's told you how it's going to go, but
24  I'm just going to ask questions and I need your answers.
25  You are under oath.

**Page 5**

1   A.   Yes.
2   Q.   And the biggest thing is, we Mississippi folks,
3   we talk with our heads a lot.
4   A.   Yes.
5   Q.   We do "uh-huh" and -- don't do that.
6   A.   Okay.
7   Q.   And, inevitably, you're going to say "uh-huh" or
8   nod your head at least once, and I will have to say, "You
9   have got to answer out loud."  I'm not being ugly.
10  A.   Okay.
11  Q.   Just got to do it.  Now, you may be the first
12  human in Mississippi that actually makes a deposition
13  without saying "uh-huh" and that would be impressive.
14  A.   Probably not.
15  Q.   Okay.  I just will -- that's kind of the way we
16  go.  Now, if you don't understand my question --
17  A.   Okay.
18  Q.   -- you tell me, "Hey, look, I don't know what
19  you're talking about"; okay?
20  A.   Okay.
21  Q.   If you answer my question, though, I'm going to
22  assume you understood it; all right?
23  A.   Yes.
24  Q.   The other thing that would be important here is
25  for us not to talk over one another.

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

---

**Page 6**

1    A.   Yes, sir.
2    Q.   I will ask a question and try and be quiet and
3 let you answer, and then if you will let me ask my
4 question before you answer, we will be fine.
5    A.   Okay.
6    Q.   All right.  If you need a break, let me know and
7 we will take one.
8    A.   Okay.
9    Q.   Are you on any kind of medication today that
10 would make it hard for you to remember things?
11    A.   No, sir.
12    Q.   Is there any reason that you can't answer my
13 questions today accurately and truthfully?
14    A.   No, sir.
15    Q.   All right.  You have given me your full name.
16 What name do you go by?
17    A.   Michael.
18    Q.   Okay.  Do you have any nicknames?
19    A.   No.
20    Q.   Okay.  So folks would just know you as Michael?
21    A.   Yes.
22    Q.   How old are you?
23    A.   Forty-two.
24    Q.   When is your birthday?
25    A.   ████████████

---

**Page 8**

1    A.   Off the top of my head, I don't remember.
2    Q.   Okay.  All right.  And if at any time during
3 your deposition, if there's something that we have asked
4 and you remember something additional, you just stop and
5 tell me; okay?
6    A.   Yes.
7    Q.   All right.  Have you ever been involved in a
8 civil lawsuit like this before?
9    A.   No, sir.
10    Q.   Have you ever given sworn testimony in court?
11    A.   Only court I went to when I had pressed charges
12 on someone that damaged my vehicle on my property, and it
13 was some underage kids, and I came here to press charges
14 against them.  That's the only court I ever been in.
15    Q.   Okay.  Did they actually put you on the stand in
16 court and let you testify?
17    A.   No, I just actually stood back here and an
18 attorney came up to me and asked me what I want to do
19 about them.
20    MR. WAIDE:  Michael, make sure you let him
21 finish his question so she can type it down.  It gets
22 a little difficult when you're both talking.
23    THE WITNESS:  Okay.
24    Q.   (By Mr. Allen) You mentioned you have a wife.
25 What's your wife's name, Mr. Jordan?

---

**Page 7**

1    Q.   You consider yourself African American?
2    A.   Yes.
3    Q.   I know that you have already told me you met
4 with your attorney to prepare for this deposition.
5    A.   Yes.
6    Q.   All right.  Now, I don't want to know anything
7 he told you; okay?
8    A.   Yes.
9    Q.   But did you review any documents?
10    A.   I had documents of -- some of my medical reports
11 and that's about it.
12    Q.   Okay.  Just some of your medical records?
13    A.   Yes.
14    Q.   All right.  Do you have any sort of photographs
15 of the incident that we're here to talk about today?
16    A.   No, sir.
17    Q.   And did you meet with anybody besides your
18 attorney to talk about your deposition?
19    A.   No, sir.
20    Q.   Did you tell anybody that you were being deposed
21 today?
22    A.   Yes, sir.
23    Q.   Who did you tell?
24    A.   Wife and a couple of friends.
25    Q.   Okay.  Who would those friends be?

---

**Page 9**

1    A.   Stephanie McFarland.
2    Q.   And when did y'all get married?
3    A.   We're not legally married.  It's just -- we been
4 together for --
5    Q.   Okay.
6    A.   -- 18 years.
7    Q.   Okay.  Y'all were together when this incident
8 occurred in 2016?
9    A.   Yes.
10    Q.   Okay.  Have you ever been lawfully married to
11 anybody?
12    A.   No.
13    Q.   Okay.  Do you have any children over the age of
14 18?
15    A.   No.
16    Q.   Do you have any under 18?
17    A.   Yes.
18    Q.   Okay.  Just tell me their names just in case I
19 get one of their, you know, caretakers on a jury.
20    A.   My son's name is ████████
21    Q.   How old is he?
22    A.   Nine.
23    Q.   All right.  Do you have any others?
24    A.   Yes.  My daughter's name is ██████████ she's
25 two.

---

Michael Jordan v.                                    Michael Jordan
Wayne County, Mississippi, et al.                    February 17, 2017

Page 10

1    Q.  All right.  Would you spell that for me?
2    A.  ▮▮▮▮▮▮▮▮
3        MR. ALLEN:  Hold on just a second, y'all.
4        (Pause.)
5    Q.  (By Mr. Allen)  What's your -- is that all your
6    kids, those two?
7    A.  Yes.
8    Q.  Okay.  Where do you currently reside?
9    A.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Waynesboro.
10   Q.  Say that again.
11   A.  ▮▮▮▮▮▮▮▮▮▮▮▮, Waynesboro.
12   Q.  Okay.  How long have you been at that address?
13   A.  Nine years.
14   Q.  Okay.  And who lives there with you?
15   A.  Stephanie and my two kids.
16   Q.  Okay.  That's it?
17   A.  That's it.
18   Q.  All right.  Did you graduate high school?
19   A.  No.
20   Q.  Okay.  Did you grow up around here?
21   A.  Yes.
22   Q.  Did you get a GED?
23   A.  No.
24   Q.  This stop was March 14, 2016.  Does that sound
25   about right?

Page 11

1    A.  I don't have the papers with me, but sounds
2    somewhere in that -- somewhere in March.
3    Q.  Okay.  I will represent to you that that's when
4    it was.
5    A.  Okay.
6    Q.  In March of 2016, did you have a cell phone?
7    A.  Yes, I had a cell phone.
8    Q.  Okay.  Who was your service with?  Is your
9    service still the same as it was?
10   A.  Everything's the same, yes, sir.
11   Q.  Okay.  Who was it with?
12   A.  C Spire.
13   Q.  Okay.  Tell me your number.
14   A.  ▮▮▮▮▮▮▮▮
15   Q.  Don't worry, I'm not going to call you.
16   A.  Okay.
17   Q.  Do you have a current valid Mississippi driver's
18   license?
19   A.  Yes.
20   Q.  Could I see that?
21   A.  Yes.
22       (Pause.)
23       MR. ALLEN:  I'm going to just take a scan of it.
24       MR. WAIDE:  That's fine.
25       MR. ALLEN:  I'll send you a copy.

Page 12

1        (Pause.)
2    Q.  (By Mr. Allen)  There you go, Mr. Jordan.  Thank
3    you.
4    A.  You're welcome.
5    Q.  Have you ever been arrested by a Wayne County
6    law enforcement officer?
7    A.  No.
8    Q.  Do you attend a church?
9    A.  Yes.
10   Q.  What church is that?
11   A.  Old St. Paul.
12   Q.  Okay.  And some of these questions, Mr. Jordan,
13   are simply because if this gets to a trial, it would be a
14   jury trial --
15   A.  Yes, sir.
16   Q.  -- and we want to know if you have a relative on
17   the jury and he'll want to know if the sheriff has one, so
18   we ask these background questions.
19       Who's the pastor there at Old St. Paul?
20   A.  Reverend Estes.
21   Q.  All right.  Do you know Pastor Steve Smith at
22   First Baptist Waynesboro?
23   A.  I have seen him, don't personally know him.
24   Q.  Okay.  Am I safe to assume, then, that y'all
25   haven't had problems between each other?

Page 13

1    A.  Yes, sir.
2    Q.  Okay.  I just want to make sure you don't think
3    he has any reason to be out to get you?
4    A.  No, sir.
5    Q.  Are you a member of any club or like social
6    organization?
7    A.  No, sir.
8    Q.  Okay.  You know my client, Sheriff Jody Ashley?
9    A.  Yes, sir.
10   Q.  How long have you known Sheriff Ashley?
11   A.  I met him about three to four years ago on a job
12   that I was doing -- a construction job.
13   Q.  Okay.  And let me ask you about that.
14       MR. ALLEN:  Daniel, he's not making any lost
15   wages claims from what I could gather in the
16   interrogatories.
17       MR. WAIDE:  No.
18       MR. ALLEN:  Okay.
19   Q.  (By Mr. Allen)  All right.  So I'm going to only
20   ask you a little bit about your business and nothing about
21   your income.  I understood you have a plumbing business or
22   is it a construction company?
23   A.  It's a construction company, but I do septic
24   systems so some people call it plumbing.
25   Q.  Okay.  When I think of construction company, I

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 14

1 think of somebody that might build houses. Do you do
2 that, too?
3    A.  No, I demo houses.  I do dirt work for houses.
4    Q.  Okay.  And then you do septic systems?
5    A.  Septic systems.
6    Q.  Anything else you do with it?
7    A.  I do Porta-Johns.  I do storm shelters.  I do
8 rental property and I do a liquor store.
9    Q.  Okay.  All right.  And is the liquor store here
10 in Waynesboro?
11    A.  Yes, sir.
12    Q.  Okay.  All right.  You said you met him three or
13 four years ago on a job.  What kind of job was that, for
14 who?  You know, give me the logistics.
15    A.  I was working for Kelley Brothers Construction.
16 I was doing some land clearing next to the riverbank and
17 we didn't know the laws on what to do being close to a
18 river when it was washing, so we was told we was not
19 supposed to get close to a river or do anything, so that's
20 when they called him in to make sure we wasn't violating
21 any laws.
22    Q.  Kelley Brothers called the sheriff in?
23    A.  Yes.
24    Q.  Okay.  And did he come out to the site?
25    A.  Yes.

Page 15

1    Q.  And you spoke with him?
2    A.  Yes.
3    Q.  And tell me about that.
4    A.  Really we just discussed the job with Tommy
5 Kelley, the Kelley -- that was on site, and he gave him
6 the laws of what needed to be done, and that's what we
7 done not to violate any laws.
8    Q.  Okay.  And did you and the sheriff have any
9 problem that day?
10    A.  No, sir.
11    Q.  Okay.  He came out and told y'all what the laws
12 were and you got your job done?
13    A.  Yes, sir.
14    Q.  Okay.  So nothing that -- you weren't angry with
15 one another?
16    A.  No, sir.
17    Q.  Okay.  Prior -- was that the first time you met
18 him?
19    A.  Yes, sir.
20    Q.  And that would have been in, what, about 2012?
21    A.  Just somewhere around there.  I'm not sure on
22 the exact dates or even the years.  It's been two or
23 three -- three or four years ago.  I'm not sure.
24    Q.  All right.  And then he ran for sheriff in 2015?
25    A.  Yes, sir.

Page 16

1    Q.  All right.  Between the first time you met him
2 and his being elected and taking office in January of
3 2016, did you have much contact with the sheriff?
4    A.  No, I seen him once or twice at funerals and
5 different things like that.
6    Q.  But let me ask it this way and see if this
7 helps, was there much one-on-one contact with him?
8    A.  Just speaking, that's all.
9    Q.  Just saying hello?
10    A.  Yes.
11    Q.  Okay.  All right.  Y'all didn't socialize
12 together?
13    A.  No, sir.
14    Q.  Did anybody in your family, Mr. Jordan, have any
15 problems with Sheriff Ashley before his election?
16    A.  No, sir.
17    Q.  Okay.  And let me ask you that about your
18 family.  You grew up around here?
19    A.  Yes, sir.
20    Q.  Are your mom and dad still alive?
21    A.  Yes, sir.
22    Q.  Okay.  Tell me what their names are.
23    A.  My mother's name is Anna Ford.  My father's name
24 is CJ Jordan, Sr.
25    Q.  Do you have any brothers and sisters in

Page 17

1 Mississippi?
2    A.  Yes.
3    Q.  Who are they?
4    A.  My brother's name is CJ Jordan, Jr.
5    Q.  That makes sense.
6    A.  My sister's name is Maticia Ford.  My brother's
7 name is Carlos McDougle, and I have another brother, Ricky
8 McDougle.
9    Q.  And those folks all live in Mississippi?
10    A.  Yes.
11    Q.  Do they live in Wayne County?
12    A.  Ricky lives in Laurel and I have another brother
13 that don't live in Mississippi.
14    Q.  What's his name?
15    A.  Steven Ford.
16    Q.  Where does he live?
17    A.  He lives in Carrollton, Georgia.
18    Q.  Okay.  I have got some friends that live there.
19 It's a nice place.
20    A.  Yes.
21    Q.  Any other family in -- in Wayne County?
22    A.  Yes, my entire family.
23    Q.  Okay.  You have got aunts and uncles?
24    A.  Yes.
25    Q.  Okay.  Tell me what last names those folks would

Michael Jordan v.                                    Michael Jordan
Wayne County, Mississippi, et al.                 February 17, 2017

---

Page 18

1  be so if they showed up, we could ask about it.
2      A.  Jordan, Bishop, Gray.
3      Q.  Is that e-y or a-y?
4      A.  A-y, McDougle, Gandy.  That's it for the most of
5  it.  I could tell you all day.  There's so many members.
6      Q.  Okay.  All right.  That's the primary ones?
7      A.  Yes, that's the primary ones.
8      Q.  Okay.  And considering all those folks, do you
9  know whether those folks have had any problems with
10 Sheriff Ashley before or after he became sheriff?
11     A.  I don't think so.
12     Q.  Okay.  Nobody's brought it to your attention?
13     A.  No, sir.
14     Q.  Okay.  Now, your attorney drafts a complaint
15 based on what you say and he files it and that's what
16 starts this lawsuit.  And your complaint says that at some
17 point during the 2015 election cycle, Jody Ashley came to
18 you and asked you to support him.  Do you recall that?
19     A.  He came to my office and I wasn't there.  Then
20 he called me.
21     Q.  Okay.  And that's what I wanted to know --
22     A.  Yes.
23     Q.  -- how it went down.
24     A.  Yes, sir.
25     Q.  So Sheriff Ashley -- Jody Ashley at that

---

Page 19

1  point -- came to your office and you weren't there?
2      A.  Yes, sir.
3      Q.  Okay.  Tell me the rest of that story.
4      A.  I wasn't there, and he came to my office, and my
5  secretary directed him -- I think he went to the shop and
6  talked to a couple of guys at the shop, and someone give
7  him my number so he called me and asked me for my support.
8  And I told him that Darryl Woodson, the current sheriff,
9  was a friend of mine that's been a friend of mine.  If he
10 wasn't running, I would support him, but if my friend was
11 running, I was going to support my friend.
12     Q.  Okay.  Where were you when he called you?  Do
13 you remember?
14     A.  Yes, I was driving.  I was out around the Beat 4
15 area.
16     Q.  Anybody with you?
17     A.  No, sir.
18     Q.  Okay.  And do you remember about when that was,
19 what month?
20     A.  Not exactly.
21     Q.  Okay.  And Darryl Woodson was the current
22 sheriff?
23     A.  Yes, sir.
24     Q.  And he was a friend of yours?
25     A.  Yes, sir.

---

Page 20

1      Q.  Okay.  When you told Sheriff Ashley that, what
2  was his reaction over the phone?
3      A.  He said that was no problem, he understood.
4      Q.  Okay.  Did he say anything else to you?
5      A.  No, that was all.
6      Q.  Okay.  He didn't make any threats towards you,
7  did he?
8      A.  No, sir.
9      Q.  From that point through the actual election, did
10 you get any other call or request by Jody Ashley to
11 support him?
12     A.  No, sir.
13     Q.  Okay.  Did you see Sheriff Ashley -- let me back
14 up.  Jody Ashley ran against Woodson.  Was that in the
15 primary or the general election?
16     A.  I'm not sure which election it was.
17     Q.  Okay.  You actually ended up being able to vote
18 for Woodson or Ashley?
19     A.  Yes, sir.
20     Q.  Okay.  And did you have any other vote after
21 that for the sheriff's race?
22     A.  No, sir.
23     Q.  Okay.  So you said you supported Darryl Woodson
24 in the 2015 election cycle?
25     A.  Yes, sir.

---

Page 21

1      Q.  All right.  And how involved in his campaign
2  were you, Mr. Jordan?
3      A.  I was heavily involved.  I had campaign signs on
4  my building, campaign signs on my truck.  I gave out cards
5  at my store.
6      Q.  Y'all have known each other a long time?
7      A.  Yes, sir.
8      Q.  How did you know Darryl Woodson?
9      A.  Doing real estate, I bought a house and it was
10 next to his residence where he lived and I grew to know
11 him from the house that I bought.  I eventually sold it to
12 him, so...
13     Q.  Okay.  Y'all were -- were y'all friends or just
14 business associates?
15     A.  We were friends.
16     Q.  Okay.  Did you attend any campaign events where
17 Sheriff Ashley was present?
18     A.  No, sir.
19     Q.  Okay.  But you put up signs for Woodson and
20 attended campaign events with him?
21     A.  Yes, sir.
22     Q.  Prior to Darryl Woodson running for office, had
23 you been involved in politics?
24     A.  No, sir.
25     Q.  Okay.  He was the first time that you had kind

---

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 22

1  of gotten involved?
2  A.  Yes, sir.
3  Q.  Okay.  Have you had the opportunity to campaign
4  for anybody since that sheriff's race in 2015?
5  A.  No, sir.
6  Q.  There's really only been the presidential
7  election, I guess.  Did you get involved in that?
8  A.  No, sir.
9  Q.  And, of course, I can't read the future, but I
10 suspect you're going to be involved in the next sheriff's
11 race; is that something you would do again?
12 A.  I don't know at this moment.  I have been
13 debating on it.  I don't know if it's worth it or not.
14 Q.  Okay.  Why would it — I mean, what do you mean
15 by that?
16 A.  The trouble I had since this one.
17 Q.  Okay.  What kind of trouble?
18 A.  Being here right now.
19 Q.  Giving a deposition?
20 A.  That's right.
21 Q.  Okay.  You aren't going to get out and try and
22 get somebody else voted in instead of Sheriff Ashley?
23 A.  I'm really not interested in it.
24 Q.  Okay.  Once -- let's see, now, Sheriff Woodson
25 had one term as sheriff of Wayne County?

Page 23

1  A.  Yes, sir.
2  Q.  Okay.  And you -- did you get involved in his
3  campaign when he did get elected as sheriff?
4  A.  After he got elected?
5  Q.  Yes, sir.  You know -- let's back up.
6  A.  Okay.
7  Q.  Sheriff Woodson was the sheriff before Jody
8  Ashley beat him in 2015?
9  A.  Yes, sir.
10 Q.  All right.  Were you involved in that previous
11 campaign to get Darryl Woodson elected?
12 A.  Yes.
13 Q.  All right.  And did you stay friends with him
14 after he was elected?
15 A.  Yes, sir.
16 Q.  Okay.  Did you come up to the sheriff's office
17 for meals and things like that?
18 A.  Yes, sir, I came about three, maybe four times
19 during — or maybe Christmas when they have a little
20 Christmas luncheon or something.  He invited me up three
21 or four times over the term of the four years.
22 Q.  Okay.  When he invited you, were there other
23 civilians there?
24 A.  Yes, sir.
25 Q.  Okay.  Do you know — and I ask you this because

Page 24

1  you were involved in the 2015 election.  Do you know how
2  close it was — the results were between Sheriff Ashley
3  and then Sheriff Woodson?  Was it a close race?
4  A.  I don't think -- I think it might have been 600
5  or something -- 900 -- I'm not really sure on the number.
6  It wasn't just close.
7  Q.  Say that again?
8  A.  It wasn't close.
9  Q.  Wasn't close.
10 (Pause.)
11 Q.  I'm not going to mark this as an exhibit,
12 Mr. Jordan, but this is the complaint —
13 A.  Okay.
14 Q.  — that your attorney filed for you.
15 A.  Okay.
16 Q.  And I'm going to look at page 2, paragraph 9.
17 And it says there that since taking office, Defendant
18 Ashley has verbally harassed and berated persons who
19 refused to support Defendant Ashley in his election.  Now,
20 is that true?
21 A.  Yes, sir.
22 Q.  Okay.  Tell me who he has harassed for not
23 supporting him that you know about.
24 A.  Wayne Holifield, which was a local wrecker
25 service guy, which has passed since then, he came to me

Page 25

1  and told me that Sheriff Ashley called him and told him
2  that he didn't appreciate what he done to him during
3  election time by not campaigning for him, and he told the
4  sheriff that he had a right to campaign for who he wanted
5  to because it's a free country.
6  Q.  Okay.  And when did he come to you?
7  A.  I don't know the exact date.  I just happened to
8  be at my shop, and it's -- next to my office is a wrecker
9  shop -- a mechanic shop, so he delivered cars there and I
10 just happened to see him on site, and it might have been
11 around March or April, I'm not sure, and I'm not sure when
12 Mr. Holifield passed.  He passed sometime around June.  I
13 don't have the date.
14 Q.  Okay.  Who else was there with you when he told
15 you that?
16 A.  Rodney Pickens and David Ray Chambers, but I
17 don't know if they was just standing next to us when we
18 had our conversation or not, but they was on the yard.
19 Q.  Okay.  And I really was more concerned with was
20 anybody else involved in the conversation?
21 A.  I'm not sure at this time.
22 Q.  Okay.  But, now, you did not — was that a
23 telephone call that he got --
24 A.  No.
25 Q.  — from the sheriff?

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 26

1 A. Yes, telephone call.
2 Q. Okay. He told you the sheriff called him?
3 A. Yes.
4 Q. And so you didn't personally witness that?
5 A. No, sir.
6 Q. All right. Do you know of anybody else that he
7 harassed and berated because they refused to support him
8 as the sheriff?
9 A. I was told -- Chris Huntley said that he
10 harassed him by stopping at his business, telling him to
11 take the Darryl Woodson signs down because he was the
12 sheriff now.
13 Q. Chris Huntley, what's his business?
14 A. Car wash.
15 Q. Okay. And he is still alive; correct?
16 A. Yes.
17 Q. Okay. Do you know -- and you didn't witness
18 that; you just --
19 A. No, sir.
20 Q. -- got told that?
21 A. Just got told that.
22 Q. Do you know of any other person?
23 A. They don't want to be a part of it so I'm not
24 going to use anyone else's name. They didn't want to be
25 in it. They're not going to testify so -- I was told

Page 27

1 other people but they --
2 MR. WAIDE: Let me talk to him real quick.
3 MR. ALLEN: Sure.
4 (Recess.)
5 Q. (By Mr. Allen) I'm going to repeat my question
6 for you. It's basically, Mr. Jordan, do you know of
7 anybody else who alleges they were harassed or berated by
8 Sheriff Ashley because he didn't get their support?
9 A. Yes, she's no longer a judge but she was Judge
10 Jane Hutto at that time. She had lost the year before
11 Mr. Ashley come in, so she was campaigning against him,
12 and she told me he give her a call and said he will see
13 her in hell for what she done during this election,
14 pulling against him, pulling for Woodson.
15 Q. Okay. But she just told you that in a
16 conversation?
17 A. She told me in a conversation, but I asked her
18 could I use her name as -- deposition or what -- if I
19 needed -- she said she didn't want to get involved.
20 Q. I understand.
21 A. That's the reason I didn't want to tell her
22 name.
23 Q. I totally understand.
24 A. Yeah.
25 Q. I know Jane.

Page 28

1 MR. WAIDE: Just for the record, you actually
2 represent her so -- I don't think I told you that,
3 Michael.
4 MR. ALLEN: Yeah.
5 THE WITNESS: Well, I didn't want to --
6 (By Mr. Allen) That's fine. I represented her
7 in another matter.
8 A. Okay.
9 Q. Is there anybody else that you know of,
10 Mr. Jordan?
11 A. No, sir.
12 Q. Okay. And let me make sure for the record, you
13 didn't personally witness Sheriff Ashley harassing or
14 berating these people?
15 A. No, sir.
16 Q. They just told you that?
17 A. They just told me -- after they heard what
18 happened to me, they told me their story, what happened to
19 them.
20 Q. Okay. These folks that you have talked about,
21 Mr. Holifield, of course, who's passed, and these folks,
22 did they tell you that Sheriff Ashley had pulled them over
23 or written them a ticket or arrested them?
24 A. No, sir.
25 Q. Okay. Did they say that any other Wayne County

Page 29

1 law enforcement officer -- not including the city -- Wayne
2 County deputy had pulled them over or written them a
3 citation?
4 A. No, sir.
5 Q. Okay. So basically they all got phone calls
6 from Sheriff Ashley after the election telling them that
7 he was unhappy that they had not supported him?
8 A. Yes, sir.
9 Q. Do you know if he did anything else to them?
10 A. No, sir.
11 Q. Mr. Huntley, is he -- he's a male?
12 A. Yes, sir.
13 Q. What race is he?
14 A. He is black.
15 Q. Where is his business -- his car wash?
16 A. It's on 184 right across from the courthouse.
17 Q. Okay.
18 A. Maybe one block down.
19 Q. All right. I'm going to look back to your
20 complaint here at paragraph 10, and you can just read
21 along with me to make sure I say it right, "Since taking
22 office, Defendant Ashley has undertaken a campaign to
23 violate citizens' constitutional rights through unlawful
24 searches and seizures." I'm going to stop there.
25 A. Okay.

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 30

1    Q.  Tell me anyone you know of that Sheriff Ashley
2  has stopped because he's mad that they didn't support him.
3    A.  I don't have any names at this time.
4    Q.  Okay.  Have you heard that he stopped anybody
5  because --
6        MR. WAIDE:  I just want to real quick object to
7    the form just -- and for the record, that's just not
8    how that one is worded in relation to support for his
9    election.
10       MR. ALLEN:  All right.
11   Q.  (By Mr. Allen)  Let me ask it another way, also.
12   A.  Okay.
13   Q.  Do you know of anybody who feels like Sheriff
14 Ashley has unlawfully stopped them?
15   A.  No names, I don't have any names.
16   Q.  Okay.  So you don't know of anybody --
17   A.  No, sir.
18   Q.  -- individually?
19   A.  No, sir.
20   Q.  Do you know of anybody that feels like they were
21 unlawfully searched by Sheriff Ashley or his deputies?
22   A.  No, sir.
23   Q.  All right.  The next part of that says that
24 "he's undertaken to violate citizens' rights by providing
25 misleading information to news and media outlets"?

Page 31

1        Tell me an example, if you know, of where he's
2  provided misleading information to news and media outlets.
3    A.  Just posting things of drug transactions that
4  never happened and newspaper ads showing where there's a
5  lot of drug busts and guns and things collected off people
6  that never done those things, but they're in jail, and
7  once they get out, they don't fight for their rights to
8  protect theirselves because they don't have the money.
9  But when you turn the news on, it showed -- they said that
10 was not even their drugs, not their guns, but when it
11 comes on the news, it shows it was.
12   Q.  Okay.  Do you have any video or photographs of
13 those news spots or posts on media -- Facebook or
14 something?
15   A.  I don't have them.  It's in the newspaper.  I
16 could get clippings if I needed to.
17   Q.  Okay.  Did you personally witness the arrests of
18 these people so that you know whether or not it was their
19 drugs that were shown?
20   A.  No, sir.
21   Q.  Okay.  So how do you put that together?  Tell me
22 how you understand or know that these drugs or these guns
23 weren't actually those folks' and they're false?
24   A.  I know those people personally.  I get my hair
25 cut in places.  I be in places -- in stores and people

Page 32

1  talking about what happened to them, but I'm not just
2  going to involve them in my case of saying, "His name is
3  such-and-such" or -- so it's a lot of people and I don't
4  know all the information of it.
5        MR. WAIDE:  Same thing with the prior stuff, if
6    you --
7        THE WITNESS:  I don't really know the
8    information of their names and -- just people
9    talking.
10   A.  I know one guy that was in jail, and when he got
11 out, he looked at the newspaper and said, "That wasn't
12 mine."
13   Q.  (By Mr. Allen)  Okay.  Who was that?
14   A.  Ced Jones.
15   Q.  I guess the important question here, Mr. Jordan,
16 is whether you have personal knowledge --
17   A.  Yes, sir.
18   Q.  -- that those things are true?
19   A.  Yes, sir.
20   Q.  All right.  Do you know personally whether any
21 of these arrests were false or not?
22   A.  No, sir.
23   Q.  Okay.  And do you know personally whether any of
24 these news pieces you have seen were false?
25   A.  No, sir.  .

Page 33

1    Q.  Okay.  But you heard those things?
2    A.  Yes, sir.
3    Q.  Okay.  And the only person whose name you
4  remember that -- in particular that you heard and thought
5  it was false was Ced Jones?
6    A.  Yes, sir.
7    Q.  And he lives here in Wayne County?
8    A.  Yes, sir.
9    Q.  What does he do?  Do you know?
10   A.  Honestly, I don't know.
11   Q.  Okay.  Do you know if any of these folks that
12 you have heard about have filed a lawsuit about it?
13   A.  No, sir.
14   Q.  Do you know if they filed any sort of complaint
15 with the sheriff's department about these allegations that
16 this is false information?
17   A.  No, sir.
18   Q.  And you don't have any documents or anything
19 right now in your possession --
20   A.  No, sir.
21   Q.  Let me finish it.  You don't have any documents
22 in your possession pertaining to these false items on the
23 news?
24   A.  No, sir.
25   Q.  Okay.  Have you ever talked to Sheriff Ashley

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 34

1 about this so-called campaign to provide false information
2 to news and media outlets?
3    A.  No, sir.
4    Q.  There is also mention in paragraph 10 of this
5 complaint of unlawful seizures.  Do you know -- have you,
6 yourself, had anything seized by Sheriff Ashley or the
7 sheriff's department?
8    A.  No, sir.
9    Q.  No property seized?
10    A.  No, sir.
11    Q.  What about anybody else?  Do you know of anyone
12 else who feels like they have had property unlawfully
13 seized by the sheriff's department?
14    A.  No, sir.
15    Q.  All right.  The news media stuff, was that on
16 television?
17    A.  Yes.
18    Q.  Okay.  What channel?
19    A.  Channel 7.
20    Q.  Okay.  And was it on social media?
21    A.  I'm not on social media.
22    Q.  You're not?
23    A.  No.
24    Q.  Good for you.  What other outlets, if any, do
25 you know that it was in?

Page 35

1    A.  That's all I know.
2    Q.  Was it in the paper?
3    A.  Seen some things in the newspaper, yes.
4    Q.  The local paper?
5    A.  Yes, local paper.
6    Q.  Okay.  Your complaint says that you were pulled
7 over March 14, 2016.
8    A.  Yes, sir.
9    Q.  And I was just — we did have the date right.
10    A.  Okay.
11    Q.  What time of day was it?
12    A.  It was midday right after lunch, maybe between
13 12 and 1, somewhere in that area.
14    Q.  Okay.  Did you have anybody with you?
15    A.  No, sir.
16    Q.  Where were you coming from?
17    A.  The Quickway curb store, that's where I ate
18 lunch at.
19    Q.  Did you eat lunch with anybody?
20    A.  Yes, my brother.
21    Q.  Which one?
22    A.  CJ Jordan, Sr. — Jr.
23    Q.  Where were you headed?
24    A.  Back to my office.
25    Q.  And that's on Azalea?

Page 36

1    A.  On Azalea -- 145 Azalea Drive.
2       (Exhibit 1 marked for identification and
3 attached hereto.)
4    Q.  I'm going to show you what I have marked as
5 Exhibit 1.
6    A.  Okay.
7    Q.  See if you can kind of orient yourself on that.
8 It shows Court Street and it shows 145 Azalea.
9       (Pause.)
10    A.  I think that looks like my shop there.
11    Q.  All right.  I'm going to give you a blue pen
12 here.  That's kind of a funky pen, but would you kind of
13 mark -- circle your shop there for me?
14    A.  (Complied.)
15    Q.  Okay.  All right.  Let's go back here.
16       (Pause.)
17    Q.  What vehicle were you driving?
18    A.  A 2008 Ford F-350.
19    Q.  How long have you owned that vehicle?
20    A.  About four and a half -- four years.
21    Q.  On the day that you were stopped, was your
22 license plate valid or had it expired?
23    A.  Expired.
24    Q.  That was before we had quit doing inspection
25 stickers as well.  Did you have a valid inspection

Page 37

1 sticker?  Do you know?
2    A.  I don't remember.
3    Q.  Okay.  I wouldn't either.  Did your brake lights
4 work?
5    A.  As far as I know.
6    Q.  Okay.  You hadn't checked them lately?
7    A.  No, sir.
8    Q.  Turn signals work?
9    A.  As far as I know.
10    Q.  All right.  As I understand it, that shop had
11 been in the vehicle — I mean, that vehicle had been in
12 the shop for a long time?
13    A.  Yes, sir.
14    Q.  Had you just gotten it that day?
15    A.  No, sir, I got it on a Saturday.
16    Q.  Okay.  And what day was your stop?
17    A.  On a Monday.
18    Q.  Okay.  All right.  And that vehicle had been in
19 the shop for almost a year?
20    A.  It had been in there -- probably hadn't been a
21 year, probably was around June or July, somewhere in that
22 time, the engine went out.
23    Q.  Okay.  And whose shop was it in?
24    A.  Rodney Pickens leases the shop.  I actually own
25 the building, but I'm leasing it to Rodney Pickens that

Michael Jordan v.                                                Michael Jordan
Wayne County, Mississippi, et al.                               February 17, 2017

Page 38

1  does the mechanic work.
2      Q.  Where is that building?
3      A.  On 145 -- that's the one I circled.
4      Q.  So he was doing the work at a building right
5  where you work?
6      A.  Yes.
7      Q.  Okay.  So when I look at this exhibit, you
8  circled your shop or his?
9      A.  That's his shop, but -- actually the shop --
10  part of it is his, part of it is mine.
11      Q.  Okay.
12      A.  But we kind of divide it until -- it's like a
13  double bay on the right side, he does automotive.  On the
14  left side, I do my equipment -- my truck sat in on my side
15  of the shop, but he leases the building as far as on his
16  part for the mechanicking.
17      Q.  What about this stuff that's behind it, is this
18  yours as well?
19      A.  Yes.
20      Q.  Okay.  And is your office in the shop itself?
21      A.  No, my office is the little building right
22  there.
23      Q.  Now, is it a house, your office?
24      A.  No, sir.
25      Q.  It's a building?

Page 39

1      A.  It's a building.
2      Q.  All right.  And to get into your shop, do you
3  take this right on West --
4      A.  Yes.
5      Q.  -- Avenue?
6      A.  Yes, sir.
7      Q.  All right.  There's no entry straight off of
8  Azalea; you have to take West?
9      A.  You have to take West to come in through the
10  front gate.
11      Q.  Okay.
12      A.  To go to the back, you can go off Azalea --
13  after you pass everything --
14      Q.  Okay.
15      A.  -- you can go off the back.
16      Q.  Okay.  All right.  That makes sense.  So
17  Mr. Pickens had had to replace the engine on that vehicle?
18      A.  He actually didn't do the work.  A diesel
19  mechanic done the work.
20      Q.  Okay.  But it was at his shop?
21      A.  Yes.
22      Q.  Okay.  What had you been driving while it was at
23  his shop?
24      A.  I've got a 2000 Chevrolet GMC.
25      Q.  What color?

Page 40

1      A.  It was beige.
2      Q.  Okay.  Let's talk about the F-250 -- or F-350?
3      A.  Yes.
4      Q.  What color was it?
5      A.  It was like a burnt orange and gray at the
6  bottom -- silver at the bottom.  It was kind of a
7  two-toned color.
8      Q.  Okay.  Was it a dually?
9      A.  Yes.
10      Q.  Did it have a camper shell?
11      A.  No, sir.
12      Q.  Any kind of racks on it for equipment?
13      A.  No, sir.
14      Q.  Any bumper stickers?
15      A.  No, sir.
16      Q.  Any of those magnets you put on them?
17      A.  Yes, sir.
18      Q.  Okay.  What did it have on it?
19      A.  Elect Darryl Woodson.
20      Q.  And we're talking about in March of 2016, did it
21  have that magnet?
22      A.  At that time, I can't remember if that was on
23  the truck or not.
24      Q.  Okay.  You left the magnet on after the
25  election, though, at least for some time, you think?

Page 41

1      A.  I don't think so, no, after the -- I had them
2  on -- when the truck tore up, it was on there, but it been
3  sitting in the shop all that time after the election, they
4  probably were not on there.  The election was over.
5      Q.  Okay.  Anything else -- any other magnets on it?
6      A.  No, sir.
7      Q.  Okay.  And you were pulled over by Sheriff
8  Ashley?
9      A.  Yes, sir.
10      Q.  Okay.  Tell me where you were when that
11  happened.
12      A.  I was passing the tire center, which he sat at
13  the stop sign.  As I leave Tony's curb store, I pulled out
14  and I was passing the tire center, and he was at the
15  stop sign there and I got the right-of-way so -- I'm
16  following a car.  The car passes him, then I pass him and
17  he's still sitting at the stop sign.  And then I go --
18  maybe five, ten seconds later, I look back, I see he's got
19  lights on pulling up real fast, so I pulls to the side of
20  the road to let him pass, thinking he's getting a call on
21  something.  And then once I see him pull in behind me, I
22  pull back out into the road because I knew it wasn't no
23  good in an area with no witnesses, so I pulled on to my
24  shop.
25      Q.  Okay.  All right.  Let's go back.  Show me --

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 42

1 you said he was on Court? Or where was he?
2     A. He was on Court at the stop sign.
3     Q. All right. Let's see, that's Court right there
4 (indicating)?
5     A. Yes, right there.
6     Q. So there's a stop sign here?
7     A. Yes, sir.
8     Q. All right. Would you -- let me get you a better
9 pen that one.
10        MR. WAIDE: Do you want a red one to mark the
11     stop sign?
12        MR. ALLEN: That would be great.
13     Q. (By Mr. Allen) Would you mark the stop sign
14 there?
15     A. That's the stop sign right there (indicating).
16     Q. All right. And so -- would you mark it a little
17 bit better -- bigger?
18     A. (Complied.)
19     Q. So you're telling me you were coming down
20 Azalea?
21     A. That's right.
22     Q. All right. Where is this place you ate? Do you
23 know?
24     A. That looks like it right there (indicating).
25     Q. Okay. Not too far?

Page 43

1     A. No, not far.
2     Q. So the red circle is Tony's curb store?
3     A. Yes, sir.
4     Q. Okay. So you're coming down Azalea and you pass
5 by the sheriff who's at the stop sign on Court?
6     A. Yes, sir.
7     Q. Okay. And you see him pull up and you think
8 he's just trying to get by you. How far past the stop
9 sign were you when you pulled to the side thinking he
10 wanted to get around you?
11     A. I was somewhere in this area where there's a
12 paint and body shop.
13     Q. Put an X there.
14     A. X? It was somewhere in that area.
15     Q. Okay. The X is where you pulled to the side
16 thinking he was going to go around you on a call?
17     A. Yes, sir.
18     Q. Okay. And then you realized that was not what
19 he was doing?
20     A. Yes.
21     Q. And he was going to try and pull you over?
22     A. Yes.
23     Q. So you didn't stop there?
24     A. No, sir.
25     Q. You -- did he have his blue lights on to show he

Page 44

1 was trying to stop somebody or get around you, one?
2     A. Yes, the blue lights was on.
3     Q. Okay. So you drove on down here?
4     A. Yes.
5     Q. To --
6     A. To the driveway of my business.
7     Q. Okay. And so you drove on down here and took a
8 right on West?
9     A. Yes.
10     Q. And your business gate, is it a fence -- like a
11 metal fence?
12     A. It's a gate.
13     Q. A gate. All right. What kind of gate are we
14 talking about?
15     A. It's like a ten-foot metal fence, like -- it's
16 not a privacy. You can see through it.
17     Q. Sure.
18     A. But it's -- the fence --
19     Q. Okay, yeah. So you pulled down to that gate and
20 stopped?
21     A. Yes.
22     Q. Okay. Now, in your complaint, Mr. Jordan, you
23 say that the sheriff should have recognized your truck?
24     A. Yes, sir.
25     Q. Why is that?

Page 45

1     A. Because I had customized wheels on my truck that
2 no one else in town had. They'd been on the truck since I
3 bought it. It was 24-inch truck wheels -- 18-wheeler
4 wheels on my pickup, so it was definitely different from
5 any truck you seen in Waynesboro.
6     Q. As far as you know, that's the only truck in
7 Waynesboro that has those 18-wheeler wheels on it?
8     A. Yes, sir.
9     Q. Do you know if it's the only truck in Wayne
10 County?
11     A. No, sir.
12     Q. Now, you had not been driving that truck for
13 some time; you had been driving a Chevy?
14     A. Yes, sir.
15     Q. Okay. Do you -- did the sheriff ever ride with
16 you in that truck --
17     A. No, sir.
18     Q. -- the 350?
19     A. No, sir.
20     Q. All right. Do you recall ever running into
21 him -- not physically, literally -- but seeing him and
22 stopping and talking to him when you were in that truck?
23     A. No, sir.
24     Q. When you realized that Sheriff Ashley was trying
25 to pull you over, you saw blue lights, did you know that

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 46

1  it was Jody Ashley behind you?
2  A.  Yes, sir.
3  Q.  How did you know that?
4  A.  I seen him sitting at the stop sign.
5  Q.  Okay.  Do you know what he was trying to pull
6  you over for?
7  A.  No, sir.
8  Q.  What's the speed limit on that road?
9  A.  I think about 35, I think.
10  Q.  How fast were you going?
11  A.  Wasn't going no faster than 35.  I had just
12  pulled off from the store.
13  Q.  From Tony's?
14  A.  Yes, from Tony's.
15  Q.  Now, the sheriff said that you swerved across
16  the center line a couple of times.  Do you recall doing
17  that?
18  A.  No, sir.
19  Q.  Okay.  And as we sit here today, are you able to
20  tell me absolutely positively you did not cross the center
21  line?
22  A.  Yes, I am.
23  Q.  Okay.  So he's just wrong?
24  A.  Yes, sir.
25  Q.  Do you know that the pastor at First Baptist

Page 47

1  Church was riding with him?
2  A.  No, sir, I didn't.  At that time, I didn't.
3  Q.  And if I represent to you that he was and he
4  said that you swerved also, he's wrong also?
5  A.  Yes, sir.
6  Q.  Okay.  You had your cell phone in your hand
7  while you were driving, didn't you?
8  A.  No, sir.
9  Q.  So you were not on your cell phone?
10  A.  No, sir.
11  (Pause.)
12  Q.  About how far did you go -- about how far a
13  distance is it from where you pulled off to let the
14  sheriff pass and then decided he was getting you and drove
15  down to your shop?
16  A.  It probably was another 200 to 300 feet, I never
17  went back and marked it or --
18  Q.  Right.
19  A.  -- checked it but somewhere in there, 200 to 300
20  feet.
21  Q.  I'm just asking approximately.
22  A.  Yes.
23  Q.  Why did you not yield to the blue lights there?
24  A.  Because I had a lot of phone calls of people
25  telling me the sheriff said he was going to get you if

Page 48

1  that's the last thing he do, so once he pulled me over and
2  I was in this spot with no witnesses, I knew then it
3  wasn't a good stop for me to stop at a place with no
4  witnesses, so I pulled back out in the road so people
5  could see what was happening.
6  Q.  Okay.  Did the sheriff ever call you and say --
7  A.  No, sir.
8  Q.  Let me finish the question.  Did the sheriff
9  ever call you before that and say he was going to get you?
10  A.  No, sir.
11  Q.  Who told you over the phone that the sheriff was
12  going to get you if it was the last time he did?
13  A.  I can't remember names on that --
14  Q.  Okay.
15  A.  -- incident.
16  Q.  More than one?
17  A.  It was one that I can recall, but I can't
18  remember who it was.
19  Q.  You just remember one phone call?
20  A.  The phone call was from my Aunt Juanita.  Now I
21  remember who it was.  But she got a call and I don't know
22  who called her.
23  Q.  Okay.
24  A.  So -- to be careful, because he's putting out
25  words he's going to get you, so when he threw the lights

Page 49

1  on me, I said, well, I'm not going to stop in this area
2  with no witnesses, so I drove on to where a witness could
3  see what was happening.
4  Q.  Okay.  Why would Sheriff Ashley be so mad at you
5  when he won?  Do you have any idea?
6  A.  I don't have any idea.
7  Q.  Okay.  Once you pulled over to the gate of your
8  shop, what happened?
9  A.  I stopped and he come up to the truck.  He asked
10  to see my driver's license.
11  Q.  Did you get out before that or he walked up to
12  you in the vehicle?
13  A.  I'm really not sure how it actually happened.  I
14  can't remember if I got out before he got to me or -- I
15  know he was walking up.  I can't remember -- but I know he
16  asked for my license.  I can clearly remember he asked for
17  my license, and I gave him my driver's license, and I
18  said, "You know me."  He said, "Well, I need to see your
19  license."  So I gave him my license.
20  Q.  Okay.  Is that the -- and here's where I need to
21  get down really --
22  A.  Okay.
23  Q.  -- carefully, when Sheriff Ashley walked up to
24  you, what was the first thing he said?
25  A.  As far as I can recall, "Can I see your driver's

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 50

1  license?"
2      Q.  And then you said?
3      A.  I said, "You know me.  This is my shop here.
4  You've been here."  And he said, "Well, I need to see your
5  driver's license."
6      Q.  Okay.
7      A.  So I gave him my driver's license.
8      Q.  So take me through it.  I need to know exactly
9  where you were when that conversation happened.  Do you
10  remember if you were in or out of your truck?
11     A.  I was out of my truck.
12     Q.  Were you standing up on the door side there of
13  your truck or on the ground?
14     A.  I was standing on the ground.
15     Q.  Okay.  And where was Sheriff Ashley?
16     A.  He was next to me.
17     Q.  Okay.  Was there anybody else around you at that
18  time when he asked that?
19     A.  No, sir.
20     Q.  Okay.  Did you see any other law enforcement
21  officers nearby?
22     A.  Yes, sir, they was pulling in.  I don't know
23  their name.  After -- as soon as he stopped me, maybe --
24  maybe it was Mike Mozingo.  I'm not sure.  But he was
25  right there on scene at the time as soon as -- like they

Page 51

1  was just following each other because -- kind of came in
2  together.
3      Q.  Okay.
4      A.  But he was the first one out of his car.
5      Q.  Mike was?
6      A.  No.
7      Q.  Sheriff Ashley?
8      A.  Yes.
9      Q.  Okay.  Was anybody from your shop nearby at that
10  very point where we were just talking about?
11     A.  No, sir.
12     Q.  Okay.  How far away from the gate is your shop?
13     A.  It might be about 200 feet, just guessing.
14     Q.  Okay.  Would there be anybody working in between
15  that space between the gate and the shop or would they be
16  in the shop working?
17     A.  No, they would be in the shop.  It's just a
18  parking lot.
19     Q.  Okay.
20     A.  There's nothing between that.
21     Q.  Gravel?
22     A.  Gravel parking lot.
23     Q.  Do you remember seeing anybody out around the
24  shop when you first got stopped and talked to Sheriff
25  Ashley?

Page 52

1      A.  No, sir.
2      Q.  Okay.  When Sheriff Ashley asked you to give him
3  your driver's license, did you immediately give it to him
4  or did you question why he wanted it?
5      A.  I immediately give him my driver's license.
6      Q.  He didn't have to ask you twice?
7      A.  Yes -- well, he asked me for my driver's
8  license, then I told him, "You know me," but then I gave
9  him my driver's license.
10     Q.  Okay.  But did he ask you a second time and then
11  you gave it?
12     A.  I'm not sure on that.
13     Q.  All right.  After he looked at your driver's
14  license, what was the next thing that happened?
15     A.  I think he walked back and give my driver's
16  license to Mike, and they must have ran them or something.
17  I stayed by my truck.
18     Q.  Okay.
19     A.  Because he was -- I gave him my license and he
20  walked away from me so I'm thinking they might have ran
21  them or checked them or something.
22     Q.  Okay.
23     A.  And then he said he needed to search the
24  vehicle.
25     Q.  Okay.  At that point, who was there besides the

Page 53

1  sheriff and Mike in terms of law enforcement?  Was anybody
2  else there?
3      A.  I don't know if the narcotic was right there.  I
4  was mainly talking to him and I wasn't just looking all
5  over the place.
6      Q.  I understand.  I understand.  We don't go
7  through life thinking we're going to have to recall all
8  this for a deposition.
9      A.  Yeah, so I wasn't looking all around.
10     Q.  Even so, did anybody from your shop come out and
11  walk up to the gate?
12     A.  No, sir.
13     Q.  Okay.  While y'all were sitting there at the
14  gate and he got your license, were the blue lights still
15  on?
16     A.  I can't recall.
17     Q.  Okay.  Certainly the siren wasn't on?
18     A.  No, the siren wasn't on.
19     Q.  All right.  After the sheriff walked away with
20  your license and gave it to Deputy Mozingo, what's the
21  very next thing you remember happening?
22     A.  He was asking me to search my vehicle.
23     Q.  Who was?
24     A.  Sheriff Ashley.
25     Q.  Okay.  Tell me exactly how you remember, to the

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 54

1  best of your recollection, what he said.
2      A.  He said, "I need to search this vehicle."
3      Q.  And what did you say?
4      A.  I said, "For what reason do you have to search
5  my vehicle?"
6      Q.  And what did he say?
7      A.  Then he said he was going to search the vehicle.
8  And I asked him again, what reason, and then by that time,
9  Mike and the narcotics and everybody just started crowding
10  up.
11          And then I said something like, "Y'all are wrong
12  for what you're doing.  That's not right to push people
13  over illegal and violate their rights," and he said, "I'm
14  going to search your vehicle or I will take you to jail."
15      Q.  And what did you say?
16      A.  I didn't say anything.
17      Q.  Okay.  So this whole time, this was just Sheriff
18  Ashley and you talking?
19      A.  Yes.
20      Q.  Did Deputy Mozingo say anything?
21      A.  He never said a word the whole time.
22      Q.  Okay.  Any other officer say anything?
23      A.  It was a narcotic there.  I don't really know
24  his name, maybe Johnny Smith or something.
25      Q.  Is he white or black?

Page 55

1      A.  White.
2      Q.  Young or old?
3      A.  Middle age, I guess.
4      Q.  Like me and you?
5      A.  No, he might have been a little older.  I'm not
6  sure.  I can't look at people -- some people and tell how
7  old they are.
8      Q.  Okay.
9      A.  So he might have been between 40 -- well, 45 and
10  50, I guess.
11      Q.  Okay.  He said something?
12      A.  Yes, he told me that that was normal, what they
13  did when -- they always search people when they pull them
14  over and stuff like that.  I don't know exactly word for
15  word.
16      Q.  So did you voluntarily allow them to search?
17      A.  Yes.
18      Q.  Okay.  Tell me how that came about.
19      A.  The narcotic pulled me to the side after me and
20  Sheriff Ashley was talking about him searching my vehicle,
21  and I told him he had no -- he didn't have no reason to
22  search my vehicle because -- why.  He wouldn't ever
23  answer.  Then the narcotic kind of just pulled us to the
24  side after the sheriff threatened to take me to jail.  The
25  narcotic said, "Come here, come here a second."  And he

Page 56

1  walked me away from everybody else.
2      Q.  This guy that you're not sure who it is --
3      A.  Yeah.
4      Q.  -- maybe Johnny Smith?
5      A.  Yeah, maybe Johnny Smith.  And he told me he's
6  been in law enforcement 25 years and all kind of things
7  like that and that's just what they do whenever they pull
8  people over, they search them.  If you go ahead and let us
9  go ahead and search it, we'll let you go, won't hold you
10  up any longer.
11      Q.  Okay.
12      A.  And I asked him for what reason he have to
13  search -- "We'll let you go, just let us go ahead, we
14  won't hold you."  So I just said, "Okay."
15      Q.  You can search it?
16      A.  Yes.
17      Q.  Who -- did you tell the sheriff he could go
18  ahead and search?
19      A.  No, sir.
20      Q.  Who did you tell?
21      A.  The narcotic.
22      Q.  Okay.  The narcotics officer?
23      A.  Yes, sir.
24      Q.  Was anybody else with the two of y'all when you
25  were having that conversation?

Page 57

1      A.  No, sir.
2      Q.  Now, the sheriff didn't actually get in and
3  search the vehicle, did he?
4      A.  I don't know.  I stood back out of the way and I
5  started talking to a local police officer, and they had
6  all the doors open, four-door truck, hood up, all under
7  the fender wall, all -- just all over the place.  It was
8  like four officers there.  And I just stood out of their
9  way.
10      Q.  Who were you talking to?
11      A.  I don't really know her name.  She was a city
12  police.
13      Q.  Was it Courtney --
14      A.  Courtney, yeah, Courtney.
15      Q.  Tell me what y'all talked about.  Did it have
16  anything to do with the search?
17      A.  No.  I said, "Well, this is the first time
18  meeting you."  I said, "You called me before looking for
19  somewhere to rent."  I said, "I'm Michael."  That's all I
20  said to her.
21      Q.  Okay.
22      A.  Just introduced myself while they were searching
23  my truck.
24      Q.  Sure.  And you don't recall whether you saw the
25  sheriff actually searching?

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 58

1    A.  No, I don't recall.  I stood back.
2    Q.  At any time while they were searching and you
3  were standing back there talking to Courtney, did you tell
4  them to stop searching the vehicle?
5    A.  No, sir.
6    Q.  You just let them get it over with?
7    A.  Yes, sir, I was already late for work.
8    Q.  Okay.  And so let's do this -- I'm going to use
9  this little white board.  Do you draw well?
10   A.  No, sir.
11   Q.  Well, here, I'm going to kind of start -- and
12  Daniel can correct me if he thinks I'm wrong -- but let's
13  do this.
14       (Pause.)
15   Q.  I have put on here -- and let's see if we can
16  agree this is right -- you know better than me,
17  Mr. Jordan --
18   A.  Yes, sir.
19   Q.  -- but if this is Azalea and that's West --
20   A.  Yes, sir.
21   Q.  -- that's your gate?
22   A.  Yes, sir.
23   Q.  Does that look -- I know it's not to scale.
24   A.  That's fine.
25   Q.  But does that look okay?

Page 59

1    A.  Yes, sir.
2    Q.  Okay.  What I want to get you to do, just so I
3  understand how this thing was done, I'm going to let you
4  kind of put the cars on there for me.
5       (Pause.)
6    Q.  Let's just use this.  Would you put where your
7  truck was and then you can show me where -- your truck is
8  going to be red.  Just put where it is.
9    A.  It was -- can I finish my drawing?
10   Q.  Heck, yeah.  Add to it, man.
11   A.  I'm just saying this is the actual gate across
12  here, and this is the driveway.  I pulled -- I didn't go
13  inside the gate.  I just pulled up out of the road and let
14  them get out of the highway behind me.
15   Q.  So they could come through past --
16   A.  Off the main --
17   Q.  -- off the road?
18   A.  Off West.  So I pulled up so they could get
19  off -- well -- and so he pulled behind me and I think it
20  was Mozingo behind him and then Johnny Smith and then the
21  city police.  I was kind of surrounded by police officers.
22   Q.  Okay.  All right.  Now, let's go back through
23  and I'm going to let you just kind of -- we will use a
24  blue to mark inside these, and I'm going to -- put an M in
25  your car.  Just make an M in there.

Page 60

1    A.  (Complied.)
2    Q.  All right.  So that is -- the blue M is your
3  vehicle?
4    A.  Yes.
5    Q.  All right.  And this is going to be Sheriff
6  Ashley, so if you'll just put a little A there?
7    A.  (Complied.)
8    Q.  And then this is Mozingo?
9    A.  Yeah, Mozingo.
10   Q.  Let's put -- just put an O there.
11   A.  (Complied.)
12   Q.  All right.  That looks like a dot; correct?
13   A.  Okay.
14   Q.  And then this is the City so put --
15   A.  And then the narcotic was in his truck, too, and
16  he was back there.  Like I said, I was just surrounded.
17   Q.  Okay.  Well, I'm more interested in those two.
18   A.  Okay.
19   Q.  And then this is your City officer?
20   A.  Yes, sir.
21   Q.  Put a C.
22   A.  (Complied.)
23   Q.  All right.  So knowing this is not to scale --
24   A.  Yes.
25   Q.  -- where did you go when the search occurred?

Page 61

1    A.  I was in front of the truck kind of close to the
2  gate.
3    Q.  All right.
4    A.  Maybe ten, 15 feet away from the truck.
5    Q.  All right.  And so you put a dot where you were
6  standing during the search?
7    A.  Yes, right there.
8    Q.  Circle it.  It's a blue dot with a red circle.
9    A.  (Complied.)
10   Q.  That way we'll distinguish it.
11   A.  Yes.
12   Q.  All right.  Do you know where Sheriff Ashley was
13  when you were standing right there at the blue dot and red
14  circle?
15   A.  No, sir.
16   Q.  Okay.  All right.  And you've told me you
17  think -- how far is it from where you were standing at the
18  gate to your shop?
19   A.  I'm thinking about 200 feet.
20   Q.  Okay.  At any time, did any of your workers come
21  out there to where you were?
22   A.  No, everyone just stood in the shop door.  They
23  never came out towards the incident.  They just all stood
24  there looking, the workers and their customers and
25  everybody just looked.

Michael Jordan v.                                                    Michael Jordan
Wayne County, Mississippi, et al.                               February 17, 2017

**Page 62**

1    Q.   Stood back?
2    A.   Stood back and looked.
3    Q.   Could they hear what was going on?
4    A.   I don't think so.
5    Q.   Okay. It's far enough away they could just see
6   it?
7    A.   They could see it, yeah.
8    Q.   Okay.
9         (Pause.)
10        MR. ALLEN: What I will do is I'll take a
11   picture of that and send it to you and him. We can
12   add that as an exhibit. Is that okay with you?
13        MR. WAIDE: It will be what, Exhibit 2?
14        MR. ALLEN: Yeah.
15        (Pause.)
16    Q.   (By Mr. Allen) After you got pulled away by the
17   narcotics officer --
18    A.   Yes.
19    Q.   -- did you ever have another conversation with
20   the sheriff out there at the scene?
21    A.   No, sir.
22    Q.   Okay. When you and the sheriff were talking,
23   though, before that and he was asking for your license and
24   telling you that he was going to search it, were you
25   upset?

**Page 63**

1    A.   Yes, sir.
2    Q.   You were agitated?
3    A.   Yes, sir, i was.
4    Q.   Why were you upset?
5    A.   Because I was illegally pulled over and rights
6   being violated. Yes, I was upset.
7    Q.   Okay. The sheriff never talked to you about the
8   election while he was out there, did he?
9    A.   No, sir.
10    Q.   And other than Courtney and the narcotics
11   officer, did you talk to any other law enforcement officer
12   on the scene?
13    A.   No, sir.
14    Q.   Were you bodily searched?
15    A.   No, sir.
16    Q.   Okay. Did anybody pull a handgun on you while
17   they were out there?
18    A.   No, sir.
19    Q.   Okay. Did they draw any other type of weapon
20   while you were stopped?
21    A.   No, sir.
22    Q.   And nobody put their hands on you?
23    A.   No, sir.
24    Q.   So the search was of your truck?
25    A.   Yes, sir.

**Page 64**

1    Q.   And they didn't find any contraband?
2    A.   No, sir.
3    Q.   Nothing got damaged in your vehicle, did it?
4    A.   No, sir.
5    Q.   To your knowledge, did Sheriff Ashley say
6   anything to anybody else on the scene about your having
7   not supported him?
8    A.   No, sir.
9    Q.   Have you run into the sheriff since you were
10   pulled over March 14, 2016?
11    A.   Yes, sir.
12    Q.   Okay. Where have you seen him?
13    A.   Jones Junior College campus here in Waynesboro.
14    Q.   Okay. What was the -- what was going on there?
15    A.   Senator Roger Whitaker was in town for a little
16   luncheon.
17    Q.   Roger Wicker?
18    A.   Wicker, yeah.
19    Q.   Yeah. He was in town?
20    A.   Yes.
21    Q.   And you saw the sheriff there?
22    A.   Yes.
23    Q.   Did y'all speak?
24    A.   Yes.
25    Q.   Okay. And was it cordial?

**Page 65**

1    A.   Yes, he spoke and shook my hand and I spoke with
2   him.
3    Q.   And that was just in passing?
4    A.   Yes, sir, it was in the lobby.
5    Q.   Okay. Y'all didn't sit down and have a
6   conversation, did you?
7    A.   No, sir.
8    Q.   Okay. But both of you respectfully shook each
9   other's hands?
10    A.   Yes, sir.
11    Q.   Okay. Has the sheriff since that stop said
12   anything to you about your not supporting him?
13    A.   No, sir.
14    Q.   All right. Let me -- I mean, correct me if I'm
15   wrong. I don't think the sheriff has ever said anything
16   to you about your not supporting him, has he?
17    A.   No, sir.
18    Q.   He never has?
19    A.   No, sir, he hasn't.
20    Q.   Have you overheard him telling somebody that you
21   didn't support him?
22    A.   No, sir.
23    Q.   You know how sometimes folks will say something
24   loud so somebody next to them can hear it; that hasn't
25   happened?

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 66

```
1   A.  No, sir.
2   Q.  One of the paragraphs in your complaint says
3   that Defendant Ashley -- this is paragraph 18 -- Defendant
4   Ashley called a number of officers to assist in the search
5   of the truck. Did you hear him call for assistance?
6   A.  No, sir.
7   Q.  Okay. Did you just assume that because several
8   other officers pulled up?
9   A.  Yes, sir.
10  Q.  Okay. He did not give you any citation?
11  A.  No, sir.
12  Q.  Did he give you a verbal warning even?
13  A.  No, sir.
14  Q.  Other than the folks that were in your shop,
15  were there any other onlookers?
16  A.  People passing by. It's a busy street, you
17  know, Main Street, in and out of town, matter of fact.
18  Q.  Did you see anybody you knew that passed by?
19  A.  I wasn't looking around.
20  Q.  You were busy?
21  A.  Yeah.
22  Q.  What about in your shop, who would have been
23  back there and would have seen this?
24  A.  Rodney Pickens, David Ray Chambers, Lee Arthur
25  Powe, John Lee Blakely. It was just workers and customers
```

Page 67

```
1   that was in the shop. Everybody quit doing what they were
2   doing, looking.
3   Q.  Right. Did you -- after this was over, did you
4   talk to those folks?
5   A.  Yes.
6   Q.  Okay. I want to talk about that, but let me
7   back up --
8   A.  Okay.
9   Q.  -- that was a mistake. Tell me what happened --
10  how long did the search of your truck take?
11  A.  In all -- I wasn't never looking at time,
12  just -- probably 15, 20 minutes of -- from stopping to
13  being -- standing out there, because, you know, at first,
14  I wasn't just pulled up letting them search. We talked a
15  while about what reason and on and on before the search
16  ever started, and he said it would just take a minute.
17  But after they started searching, it was way more than a
18  minute, raising your hood, looking all under it, opening
19  all four doors, digging under your seats, pulling your
20  seats up and your glove box. It took more than a minute.
21  Q.  Oh, sure. So were you saying, though, that the
22  stop -- from the time the stop happened until the time the
23  search was completed, it was about 20 minutes?
24  A.  Probably about 20 minutes, yeah, just me
25  guessing on time.
```

Page 68

```
1   Q.  And let me make sure I got that right in the
2   record.
3   A.  Okay.
4   Q.  The whole stop took about 20 minutes?
5   A.  Yeah, just me guessing. I don't know exactly,
6   never looked at time.
7   Q.  Sure, sure. So what happened once the search
8   was completed? Walk me through that. Before you go to
9   the shop, how did it end up?
10  A.  They give me my license and they left.
11  Q.  Okay. Did you -- you never spoke with Ashley
12  again?
13  A.  No.
14  Q.  Who gave you your license back?
15  A.  I can't remember if it was Mike or who it was,
16  but no one said anything else. They just passed me my
17  license.
18  Q.  Did anybody tell you you were free to go?
19  A.  No.
20  Q.  They just handed you your license and walked
21  off?
22  A.  Yes.
23  Q.  And what did you do?
24  A.  I went on to the shop.
25  Q.  Okay. You said that the folks there, you talked
```

Page 69

```
1   to them?
2   A.  Yes.
3   Q.  Who did you speak to?
4   A.  Everybody there was asking what was that about
5   and --
6   Q.  Was it a crowd?
7   A.  A crowd, yes, a crowd, everybody still crowding
8   up from the shop, so when I pulled -- I drive on through
9   the gate, they're asking, what happened, what was that all
10  about, and this and that.
11  Q.  Did you tell them -- what did you tell them?
12  A.  I told them I was stopped for no reason.
13  Q.  Anything else?
14  A.  No.
15  Q.  All right. Did you tell them that you were
16  stopped because Ashley was mad at you for supporting --
17  for not supporting him?
18  A.  No.
19  Q.  Prior to that, had you ever been pulled over by
20  any law enforcement officer?
21  A.  Yes.
22  Q.  Okay. More than once?
23  A.  Yes, I have speeding tickets before.
24  Q.  Have you ever had your vehicle searched?
25  A.  No, sir.
```

Michael Jordan v.                                          Michael Jordan
Wayne County, Mississippi, et al.                       February 17, 2017

Page 70

1    Q.  Since that day, other than the folks in the
2  shop, has anybody approached you about your stop and said,
3  "Hey, I heard you got stopped," or something to that
4  nature?
5    A.  Yes.
6    Q.  Tell me who that would be.
7    A.  I can't remember so many names.  It went on for
8  days and days, phone calls, and – just constantly for
9  probably the first three months maybe, people were just
10  calling and you run into them in the store.  It went on,
11  "So how is you and the sheriff getting along," just joking
12  about it, just on and on for probably three or four
13  months.
14    Q.  You don't remember any name?
15    A.  No, sir.
16    Q.  Your complaint says that during the stop, the
17  sheriff treated you like a criminal.  What do you mean by
18  that?  I mean, I understand you didn't draft it, but did
19  he treat you like a criminal?
20    A.  Yes, to me it was.  If you're searched and you
21  haven't done anything, I think you are treated like a
22  criminal.
23    Q.  Okay.  Anything else besides his searching
24  you – your truck?
25    A.  No, sir.

Page 71

1    Q.  You were not arrested that day?
2    A.  No, sir.
3    Q.  And you didn't go to jail?
4    A.  No, sir.
5    Q.  And you didn't pay a fine, did you?
6    A.  No, sir.
7    Q.  They didn't take anything out of the truck at
8  all whether it was contraband or not and keep it?
9    A.  No, sir.
10    Q.  You saw the sheriff at Jones.  Have you seen him
11  since and had any conversation with him?
12    A.  Yes, sir.
13    Q.  Tell me when that was.
14    A.  It was maybe a month ago here.
15    Q.  Okay.  How was it here?  What happened?
16    A.  I was here to get fingerprints and he was
17  leaving the parking lot and he saw me and he stopped and
18  asked what did I need, and I told him.  He say they would
19  take care of me in the back, go in the back, they would
20  help me to get my fingerprints for my store for the
21  State -- I had to get new fingerprints to move my store to
22  a new location, so I come to get fingerprints.
23    Q.  Okay.  Did he help you out?
24    A.  Yes, sir, he did.
25    Q.  Was he cordial to you?

Page 72

1    A.  Yes, he was.
2    Q.  And you were cordial to him?
3    A.  Yes, sir.
4    Q.  Did either one of you talk about the stop?
5    A.  No, sir.
6    Q.  Did either one of you talk about the election?
7    A.  No, sir.
8    Q.  Okay.  All right.  Let's talk about some of
9  these folks that -- that you have mentioned that were in
10  your responses to some questions I sent you.  One of the
11  people you identified as having some knowledge about this
12  is Leon Powe?
13    A.  Lee Arthur Powe.
14    Q.  Lee Arthur Powe.  And he's a customer?
15    A.  Of Rodney Pickens.
16    Q.  So, now, Rodney Pickens rents a building from
17  you but you're not affiliated with his business?
18    A.  No, sir.
19    Q.  No partnership?
20    A.  No, sir.
21    Q.  And he was there that day as a customer of
22  Mr. Pickens?
23    A.  Yes, sir.
24    Q.  And have you spoken with Mr. Powe other than
25  kind of addressing the crowd that day?

Page 73

1    A.  I spoke with him – I think it was yesterday, he
2  come by the shop, and he was headed to Hattiesburg to the
3  doctor, he said.  He called – got to the office and my
4  secretary called me and said, "Mr. Powe is here to see
5  you.  Are you on the yard?"  I said, "No."  And I said,
6  "I'm a minute away."  So when I pulled up, he told me he
7  received letters from a lawyer and that his name was wrong
8  on the paperwork so he come somewhere to get it corrected.
9  I think he might have came here.
10    Q.  Yes, sir.
11    A.  And he said he would come whenever they told him
12  to come, but he just wanted them to know the name was
13  wrong.
14    Q.  Right.  We served him with a subpoena and got
15  his name wrong.
16    A.  Okay.
17    Q.  So we re-served him today.
18    MR. WAIDE:  Did we have his name wrong?
19    MR. ALLEN:  Yeah.
20    MR. WAIDE:  Sorry about that.
21    MR. ALLEN:  That's okay.  We got it.
22    A.  That's the only time I ever spoke to him.
23    Q.  (By Mr. Allen)  Okay.  All right.  When y'all
24  talked yesterday, did he talk to you at all about the
25  stop?

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 74

1   A.   No, he said he talked with an attorney.  I don't
2   know if it was you.  I don't know if it was you.  I don't
3   know who he talked with on the phone.  And he said he just
4   let them know he didn't feel like it was right because he
5   saw me at -- eating lunch with my brother a few minutes
6   before the stop and he didn't feel like it was comfortable
7   to have that many police officers stopping a person for no
8   reason.
9   Q.   Okay.
10  A.   That's what he told me.
11  Q.   Now, he didn't personally witness the stop,
12  though, did he?
13  A.   I'm not sure.
14  Q.   Okay.  All right.  Did he say anything else to
15  you about the stop?
16  A.   That was it.
17  Q.   Okay.  You said you had seen him before lunch;
18  is that what he said?
19  A.   He said he saw me.  I didn't see him.
20  Q.   Okay.  Was he at your shop, though, when the
21  stop occurred?
22  A.   He said he was.  I didn't see him --
23  Q.   Okay.
24  A.   -- at that time, you know.
25  Q.   Okay.

Page 75

1   A.   I don't know who was in there.  I never made it
2   to the shop.  I'm leaving lunch, so I never made it to see
3   who was actually in there when I first got stopped.  But
4   if he came through later, I don't know.  There's two ways
5   to get in so I'm not sure.
6   Q.   Okay.  Let me ask a better question.
7   A.   Okay.
8   Q.   After the stop, when you pulled up to the shop,
9   do you remember seeing him there?
10  A.   Yes.
11  Q.   Okay.  All right.  That's what I was wondering.
12  A.   Okay.
13  Q.   What about Johnny Blakely?
14  A.   He was in the shop when I pulled up.
15  Q.   Is he a customer of Mr. Pickens, too?
16  A.   Yes, sir.
17  Q.   Do you remember talking to him that day?
18  A.   No, sir.
19  Q.   Have you talked to him since about the stop?
20  A.   No, sir.
21  Q.   Have you ever talked to him about whether or not
22  Sheriff Ashley was upset with you?
23  A.   No, sir.
24  Q.   Have you ever talked to Mr. Powe about whether
25  Sheriff Ashley was upset with you?

Page 76

1   A.   No, sir.
2   Q.   And then you mentioned David Ray Chambers.  Who
3   is he?
4   A.   He works for Rodney Pickens.
5   Q.   Okay.  And he was there that day when you pulled
6   to the shop after the stop?
7   A.   Yes, sir.
8   Q.   Okay.  Did you talk to him individually?
9   A.   No, sir.
10  Q.   All right.  What about since this stop, have you
11  talked to him at all about the incident?
12  A.   I talked to him the day he got his letters.
13  Everybody started calling me, "We're getting letters from
14  an attorney," and this and that, or calls, and he said,
15  "Well, I just talked to your attorney about what happened
16  and I told him what I saw.  I didn't hear anything."  He
17  said, "I just seen it from a distance.  I didn't hear
18  nothing."  That's what he said he told him.
19  Q.   So that's the last time you have talked to him?
20  A.   Yes, sir -- well, I talked to him this morning.
21  He's at the shop every morning.
22  Q.   Okay, right.  And that was a bad question.
23  A.   Yeah.
24  Q.   About the incident?
25  A.   No, sir.

Page 77

1   Q.   So the only times you have talked to him about
2   the incident were the day it happened and the day he got
3   served with a subpoena?
4   A.   Got served.  I've talked to him between times,
5   you know, not just a daily thing, but I have talked to
6   him, can't recall dates, you know, just general
7   conversations of being in the same area.
8   Q.   Oh, no, sure.  And I made -- that was a bad
9   question.  I know you see these people all the time.
10  A.   Yeah, I see them every day.
11  Q.   What I want to know is the conversations about
12  your incident.
13  A.   No, sir, we never talk about the incident.
14  Q.   And have you ever talked to him -- Mr. Chambers
15  about whether or not Sheriff Ashley was upset with you for
16  not supporting him?
17  A.   No, sir, I haven't.
18  Q.   All right.  Now, Rodney Pickens is your -- he's
19  your renter?
20  A.   Yes, sir.
21  Q.   And he has a body shop or a --
22  A.   Mechanic.
23  Q.   Mechanic, okay.  He was there the day that the
24  incident occurred?
25  A.   Yes, sir.

Michael Jordan v.                                                      Michael Jordan
Wayne County, Mississippi, et al.                                    February 17, 2017

Page 78

1    Q.  And did you talk to him afterwards?
2    A.  After I talked with everyone, I went to work. I
3  had an appointment for the State to do a septic system
4  that day and I was supposed to been there at a certain
5  time and I was already running late, so I didn't just
6  stand around and talk to people. I went on to my job.
7    Q.  Okay.  So since the stop, have you talked to
8  Mr. Pickens about the stop itself?
9    A.  We have talked.  I can't say exactly what we
10 have talked about as far as the stop, but, yeah, I'm sure
11 I have talked to him.  It's been almost a year.
12   Q.  Okay.  All right.  Have you and he ever talked
13 about whether or not Sheriff Ashley was upset with you for
14 not supporting him?
15   A.  No, he hasn't really said that.  He just said
16 that -- well, we had Woodson signs up, and he take it that
17 he must have been upset with me.  We didn't just say, I
18 know he was.  He said, "Well, we had Woodson signs up.  He
19 must not have been comfortable with that."
20   Q.  Uh-huh.  All right.  Now, Lawrence Jones was a
21 customer of Mr. Pickens?
22   A.  Yes, sir.  I didn't see him.  He told people at
23 the barbershop he come by and saw -- he wasn't a customer
24 at that time.  He said he drove by and seen it and he went
25 to the barbershop telling people that he's in a drug bust,

Page 79

1  the narcotics got his truck, they're all over him.
2         Then next thing I know, I got rumors, my door
3  got kicked off my house by -- it just grew from one thing,
4  more, more and more, and I feel like that endangered my
5  family off of that stop.
6    Q.  So Mr. Jones drove by in his car?
7    A.  Yes.
8    Q.  And went to the barbershop?
9    A.  Yeah.
10   Q.  Where all good rumors get started?
11   A.  Yeah.
12   Q.  And told everybody you had been busted for
13 drugs?
14   A.  Yeah.
15   Q.  Now, you said your door had been kicked in.
16 That was a rumor.  That didn't really --
17   A.  That was a rumor.  No, it just spreaded from one
18 thing to another and got bigger and bigger.  You know, one
19 word's going to get twisted and it just --
20   Q.  Absolutely.
21   A.  -- it grew for months.
22   Q.  Did you ever talk to Mr. Jones about the shop
23 and straighten him out?
24   A.  No, sir.
25   Q.  I mean, it wasn't a drug bust, was it?

Page 80

1    A.  No, sir.
2    Q.  There were no drugs in your vehicle?
3    A.  No, sir, never sold drugs.
4    Q.  Courtney Cranton is the name of the City officer
5  that I have.  Is that who you were talking to out there?
6    A.  I just know her by Courtney.
7    Q.  Okay.
8    A.  My first time ever meeting her at that time.
9    Q.  Okay.  Have you seen her since then and talked
10 about this incident?
11   A.  No, sir.
12   Q.  And then Randy Williams?
13   A.  He owns the shop next door.
14   Q.  Okay.  Does he rent from you?
15   A.  No, sir.  He owns the building next door.
16   Q.  Okay.  Have you talked to him about your stop?
17   A.  No.  After the stop, I don't know if -- it
18 wasn't that day because I left and went to work.  Maybe a
19 couple days later, he said, "I saw y'all out there.  He
20 had you pulled over.  I was going to come over there, but
21 I didn't."  That's all I talked to him about.
22   Q.  Hadn't seen him since to talk about this
23 incident?
24   A.  No, sir.
25   Q.  Okay.  Is there anybody else that might have

Page 81

1  seen this that you're -- you can positively identify?
2    A.  No, sir.
3    Q.  Is there anybody else that you can positively
4  identify that has mentioned to you that they saw you
5  pulled over or something about the stop?
6    A.  No, I got calls from my brother that works at
7  Masonite saying that people are calling him saying, "They
8  got your brother pulled over," and this and that, so...
9    Q.  What's his name?
10   A.  Carlos McDougle.
11   Q.  Okay.  All right.  Mr. Jordan, do you need to
12 take a break?  Are you okay?
13   A.  No, sir, I'm fine.
14   Q.  All right.
15       (Recess.)
16   Q.  Did you tell anybody yourself about the stop?
17   A.  Yes, sir, I did.
18   Q.  Okay.  Who did you approach to tell about the
19 stop?
20   A.  I can't recall names.  It's been 11 months ago
21 now.
22   Q.  Yes, sir.  So you had a job for the remainder of
23 the day of the stop for the State?
24   A.  Yes, sir.
25   Q.  All right.  You went and did that job?

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 82

1   A.  Yes, sir.
2   Q.  Did you see a medical provider that day for
3   anything that occurred because of the incident?
4   A.  No, sir.
5   Q.  Did you have any sort of symptoms that day of
6   medical problems?
7   A.  That day, no, sir.
8   Q.  Okay.  When did your symptoms first develop and
9   what were they?
10   A.  The next day, I had a headache -- well, all
11   during that night, it was not that day, it was that night,
12   and then the next day, I just went for a checkup and they
13   give me something for blood pressure maybe.
14   Q.  All right.  Was your blood pressure high; is
15   that what you're telling me?
16   A.  Yes, sir.
17   Q.  Okay.  Have you ever had high blood pressure
18   before?
19   A.  No, sir.  I had borderline blood pressure, never
20   high.  I take a five-milligram pill for blood pressure.
21   Q.  Okay.  How long have you been on that kind of
22   medication?
23   A.  I think about a year.
24   Q.  So you were on it before this stop?
25   A.  Yes, sir.

Page 83

1   Q.  Did the medication -- did you have to take more
2   of it after the stop?
3   A.  I continued to take my regular dosage, but I
4   took something different that was give to me at the doctor
5   visit, stronger I guess.  I don't really know what it was.
6   Q.  So you took it on top of what you took, your
7   normal dose?
8   A.  Yes, sir.
9   Q.  Okay.  How long did you do that?
10   A.  I done it for like a day or two.  It wasn't a
11   prescription.  It was just a little -- I don't know what
12   they call -- a little sample.
13   Q.  A sample?
14   A.  Yeah.
15   Q.  He just gave you a sample of something for a day
16   or two?
17   A.  Yeah.
18   Q.  Okay.  Was that able to get your blood pressure
19   back under control?
20   A.  Well, my headache stopped so I didn't go back
21   and check my pressure behind it.
22   Q.  Okay.  So you haven't been back to check your
23   blood pressure since then?
24   A.  I have checked it since then.  It probably -- it
25   was probably five months after on just a routine doctor

Page 84

1   visit.
2   Q.  Okay.
3   A.  They always check it then.
4   Q.  Was it okay?
5   A.  It was back to the borderline thing, yeah.
6   Q.  Was the same doctor doing all these tests?
7   A.  No, sir.
8   Q.  Where were you when you originally went to get
9   it checked the day after the incident?
10   A.  It was the emergency room.
11   Q.  Wayne General?
12   A.  Yes, but might have been -- yes, it was the
13   emergency room the first day I went.
14   Q.  Okay.  Now, when you have a routine checkup like
15   you talked about, who is your doctor?
16   A.  Dr. Todd Stokley is my family doctor, but I have
17   a specialist for my kidneys in Hattiesburg.  I can't
18   recall his name right now.
19   Q.  Is he at the Hattiesburg Clinic?
20   A.  Yes.
21   Q.  Okay.  Any other medical providers that you
22   would see?
23   A.  No, sir.
24   Q.  I want to move on into some things like that,
25   your medical records and stuff like that, but I want to

Page 85

1   make sure we have covered this -- the actual stop.  Have
2   you told me all of the conversations that you have had
3   with Sheriff Ashley about your being pulled over that day
4   in March?
5   A.  Yes, sir.
6   Q.  Have you told me all the conversations you have
7   had with any Wayne County law enforcement officer about
8   that stop in March 2016?
9   A.  Yes, sir.
10   Q.  All right.  Your complaint, Mr. Jordan, asserts
11   that you have suffered emotional distress as a result of
12   your being stopped.  Can you explain to me in your own
13   words what that means?  How have you been hurt
14   emotionally?
15   A.  Emotionally, it's just mentally that -- it's
16   kind of hard to explain, but it does something to your
17   focus on your daily basis because that's always on your
18   mind, just like you -- if you lost your mother, that's
19   going to be on your mind for a while.  It's kind of like
20   the same thing, just damage to you mentally.
21   Q.  Okay.  All right.  And other than going to the
22   ER, have you seen any medical provider as a result of this
23   incident?
24   A.  Just only my specialist, and that's just a
25   six-month checkup on my kidneys.  Every six months, I go

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

**Page 86**

1 to a specialist. They tell me the ratings of creatinine
2 level and what it's doing now. And the next six months,
3 they do the same thing.
4    Q. So you already had that scheduled. You were
5 going to see him regardless?
6    A. Yes, I was going to see him regardless.
7    Q. But did you talk to him about the incident?
8    A. No, sir, I didn't.
9    Q. Okay. Obviously, you have some sort of issue
10 with your kidneys?
11    A. Yes, sir.
12    Q. What is it? Is it a --
13    A. A birth defect.
14    Q. Okay. All right. And has there been -- as far
15 as you know, I recognize you're not a doctor -- as far as
16 you know, has there been any impact on your kidneys
17 because of this incident?
18    A. Well, I could tell you one thing for sure, my
19 kidney level got worse after the incident. Now it's back
20 on the same level. I did get my medical report. I
21 haven't give it to the attorney because I had to order it
22 and it finally came, but I haven't been back to his
23 office.
24    Q. Sure.
25    A. But, yes, sir, my creatinine level got worse.

**Page 87**

1 The higher the points, the worse your kidneys are
2 operating. And he always told me never get stressed, and
3 stress does damage to your kidneys. And if you keep blood
4 pressure up, your blood pressure does damage to your
5 kidneys, but I couldn't help it.
6    Q. Okay. Did the doctor tell -- you didn't talk to
7 the doctor about the incident?
8    A. No, I didn't tell the doctor about the incident.
9    Q. Okay.
10    A. So -- he told me that way before the incident,
11 what damages the kidneys --
12    Q. Okay.
13    A. -- and stuff like that.
14    Q. Okay. Other than your kidney doctor, have you
15 seen any other medical provider since this incident?
16    A. No.
17    Q. Whether it was for the incident or not, have you
18 seen any other medical provider?
19    A. No.
20    Q. Haven't had to go to the emergency room?
21    A. No, not since the first time.
22    Q. Good. Is it Brian Rifkin, is that who it is?
23    A. Yes.
24    Q. Okay. Who's your family doctor, Stokley?
25    A. Dr. Stokley.

**Page 88**

1    Q. Okay. You've seen him for quite some time?
2    A. Yes, sir.
3    Q. Okay. Prior to March 14, 2016, had you ever
4 seen a physician for anxiety or depression?
5    A. No, sir.
6    Q. Okay. Now, you were on a blood pressure
7 medication when this happened?
8    A. Yes, sir.
9    Q. Other medications that you were on at the time,
10 are there any?
11    A. No, only other prescription I have had within
12 the last -- past year maybe for like gout. I've got a
13 prescription for that.
14    Q. Okay.
15    A. Something I don't take daily or sometimes -- it
16 might be four or five months. You just -- if it flares
17 up, I have the medication.
18    Q. Does Dr. Stokley take care of that for you?
19    A. Yes, sir.
20    Q. Okay. So that's the only medication you were on
21 at the time, so it's something for gout and something for
22 blood pressure. Since this incident, have you added
23 anything besides that little pill you told me they gave
24 you a sample of?
25    A. No, sir.

**Page 89**

1    Q. Okay. And you use LAB Drugs in Waynesboro?
2    A. Yes, sir.
3    Q. Is that the only pharmacy you use?
4    A. Yes, sir, in the last several years, it has
5 been.
6    Q. Okay.
7    A. I used to use --
8    Q. Cooley?
9    A. No, it was Walgreen's -- no, it was Stanley at
10 the time but they sold out to Walgreen's, but since then,
11 I've been using LAB, but that's been several years now.
12    Q. Cooley's closed, didn't it?
13    A. Yeah, Cooley's closed.
14    Q. All right. If I read your responses right,
15 you're not claiming that this incident caused you to lose
16 money in your business?
17    A. I'm not suing for it. It did, but I'm not going
18 to go through all of that.
19    Q. All right. That's not what you're suing for?
20    MR. WAIDE: Right.
21    MR. ALLEN: Okay.
22    Q. (By Mr. Allen) But you do think you've had a
23 loss of reputation as a result of this?
24    A. Yes, and business, too. But I'm just not going
25 to go through the hassle of it.

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 90

1    Q.   All right.  So since you're not worried about
2  business --
3    A.   That's right.
4    Q.   -- and that's not a claim, let's talk about loss
5  of reputation because you are making that claim.
6    A.   Yes, sir.
7    Q.   Okay.  Tell me -- tell me about that.  How have
8  you lost your reputation or some of your reputation as
9  part of this incident?
10    A.   Well, when you've got a town of people that know
11  you and now they're talking negative about you and saying,
12  well, he must have been selling drugs because I see he's
13  got a business, and his family ain't got this and that, so
14  it's just -- it's an ongoing process that I had to deal
15  with from that day to now.
16    Q.   Okay.  It's people -- am I right to say it's
17  people making false assumptions?
18    A.   That's right.
19    Q.   Okay.  Did you feel the same way when you got
20  pulled over for those speeding tickets?
21    A.   No, sir.  I was speeding.
22    Q.   Okay.  All right.  But folks don't know that
23  that are passing by.  They make the same assumptions,
24  don't they?
25    A.   No, sir, your hood's not up and your doors are

Page 91

1  not open.  It's totally different.
2    Q.   Okay.  So it's because you were searched?
3    A.   Yes.
4    Q.   Okay.  Has anybody said directly to you that
5  they thought that you were stopped because of drugs?
6    A.   No, sir.
7    Q.   Your complaint also says you suffered a loss of
8  enjoyment of life.  Is there anything you can't do now
9  that you could do before this incident?
10    A.   No, sir.
11       (Pause.)
12    Q.   We've talked about these folks you listed in
13  your initial disclosures, and I'm going to read you this
14  list and I think we can just wrap that up.
15    A.   Okay.
16    Q.   The folks that you listed as having knowledge
17  were Wayne Holifield, who has passed away?
18    A.   Yes, sir.
19    Q.   And we agree that he did not -- he was not
20  present when you were stopped --
21    A.   No, sir.
22    Q.   -- at the site of the stop?
23    A.   Yes, sir.
24    Q.   Lee Arthur Powe, not Leon, Lee Arthur Powe also
25  was at the shop but was not where you were actually

Page 92

1  stopped?
2    A.   As far as I know, he was at the shop.
3    Q.   Okay.  And so he didn't personally witness any
4  of the conversations between you and the officers?
5    A.   No, sir.
6    Q.   To your knowledge, did he actually see the blue
7  lights come on on the sheriff's vehicle as he pulled you
8  over?
9    A.   I'm not sure of that.  I don't know --
10    Q.   You don't know?
11    A.   -- exactly where he was.
12    Q.   Okay.
13    A.   No, sir, I don't know.
14    Q.   Okay, fair.  What about Johnny Lee Blakely, he
15  was not present to hear the conversations that day between
16  you and the law enforcement officers stopped at your gate,
17  was he?
18    A.   No, sir.
19    Q.   And do you know if he actually saw the stop
20  being made?
21    A.   No, sir, I'm not sure.
22    Q.   Okay.  All right.  Mr. David Ray Chambers, he
23  was not present at the gate where the officers
24  were talking to you at the stop?
25    A.   No, he was in the shop.

Page 93

1    Q.   In the shop?
2    A.   Yes, sir.
3    Q.   And do you have any idea whether he actually saw
4  the stop take place?
5    A.   No, I'm not sure.
6    Q.   And when I say that, you know what I'm talking
7  about?
8    A.   Yes, when he first pulled me over.
9    Q.   Yeah.
10    A.   I'm not sure.
11    Q.   Okay.
12    A.   The shop has two big open bay doors and they
13  were right there working so I don't know if they looked up
14  when I was pulling in.
15    Q.   Yeah.
16    A.   It's got gravel.  You can hear a car pulling in.
17  But I don't know if they looked up immediately or what
18  they were doing.
19    Q.   Let me just be frank with you.  What I'm wanting
20  to know about is anybody who was standing there with you
21  with the officers and heard anything?
22    A.   No, sir, nobody was standing with me.
23    Q.   It was just you and the law officers?
24    A.   Yes, sir.
25    Q.   And then anybody that was out there on the

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 94

1 highway driving that might have seen the sheriff pull you
2 over?
3     A. Nobody I know of.
4     Q. Okay. That cuts this short for me.
5         All right. Since this occurred, have you talked
6 to any other -- I know you talked to the sheriff. But
7 have you talked to any other Wayne County law enforcement
8 officers?
9     A. I have done work for Fred Daniels. I done a
10 septic system for him.
11    Q. Did y'all talk about the stop?
12    A. No, sir.
13    Q. Okay. Is there any officer you have talked to
14 about this stop?
15    A. Sheriff's department officer?
16    Q. Yes, sir.
17    A. No, sir.
18    Q. Okay. What evidence do you have that the reason
19 Sheriff Ashley stopped you was because you didn't support
20 him in the election?
21    MR. WAIDE: Object to form.
22    Q. (By Mr. Allen) You can answer.
23    MR. WAIDE: Yeah.
24    A. What's the question again?
25    Q. (By Mr. Allen) Let me ask you --

Page 95

1     A. Make sure I understand you clearly.
2     Q. Yeah, sure. What evidence do you have that the
3 reason Sheriff Ashley stopped you was because you didn't
4 support him in the election?
5     A. Well, I don't have no evidence on that. What I
6 have is he had no other reason to stop me, so I took it
7 that that was the reason.
8     Q. Okay. I understand.
9     MR. ALLEN: Let me have a minute.
10    MR. WAIDE: Go ahead.
11    (Pause.)
12    Q. (By Mr. Allen) Mr. Jordan, do you know who
13 Wayne Holifield supported in the sheriff's election
14 between Sheriff Woodson and Sheriff Ashley?
15    A. Sheriff Woodson is what he told me.
16    Q. Okay. How about Arthur Lee Powe (sic)?
17    A. Sheriff Woodson, as far as I know.
18    Q. Okay, yeah. I understand you weren't in the
19 voting booth.
20    A. Yeah.
21    Q. They told you that they supported --
22    A. Yes.
23    Q. -- either -- and that's what I want to know, who
24 they told you they supported. What about Johnny Lee
25 Blakely?

Page 96

1     A. I never asked him anything about it. He
2 actually mainly lives in Alaska. He owns property in
3 Alaska. He has a house here. He stays in Alaska six,
4 seven months out of the year. He comes here six, seven --
5 so he probably didn't vote for anyone.
6     Q. Right. What about David Ray Chambers?
7     A. I don't know if voted for anyone. As far as I
8 know, he supported Sheriff Ashley.
9     Q. Okay. What about Rodney Pickens?
10    A. He don't vote for anyone. He's Clarke County.
11    Q. Vote for Todd Kemp?
12    A. Yeah, but no one really, yeah.
13    Q. What about Lawrence Jones, do you know -- he
14 tell you who he voted for?
15    A. No, don't even talk to him.
16    Q. Okay. And Randy Williams?
17    A. As far as I know, Sheriff Ashley.
18    Q. Okay. When -- have you ever done any work for
19 anybody in Sheriff Ashley's family?
20    A. Yes, I worked for his mother.
21    Q. Okay. What have you done for her?
22    A. I done some roof work, cutting limbs off her
23 house, stuff like that.
24    Q. When did you do that? Do you know?
25    A. It might have been about two and a half years

Page 97

1 ago. I can't really recall the exact time. It's been a
2 little while.
3     Q. Okay.
4     A. Longer than that, I'm not sure.
5     Q. Do you have personal knowledge that Sheriff
6 Ashley told anybody that he stopped you for drugs?
7     A. No, sir.
8     Q. Okay. Do you have knowledge that Sheriff Ashley
9 told anybody he stopped you because you didn't support
10 him?
11    A. No, sir.
12    Q. The day that you were talking about you were out
13 here with your aunt, I want to ask you a couple of
14 questions. Wasn't it your aunt that had to get
15 fingerprinted?
16    A. No, sir.
17    Q. Who were you here with?
18    A. No, I was here with Stephanie.
19    Q. Okay. You were here with Stephanie, your
20 girlfriend?
21    A. Yes.
22    Q. Okay. And that was -- we're sitting at the
23 sheriff's office right now; correct?
24    A. Yes.
25    Q. Okay. When y'all were here, you and Stephanie,

Michael Jordan v.
Wayne County, Mississippi, et al.

Michael Jordan
February 17, 2017

Page 98

1  Sheriff Ashley actually got out of his vehicle and came
2  over to where y'all were, didn't he?
3      A.  She wasn't with me.  She drove her own vehicle.
4      Q.  Okay.
5      A.  She came.  I was meeting her here.
6      Q.  Okay.
7      A.  And I parked out front.  And I just pulled up
8  and I was talking to Jason Powe, asking him about where I
9  needed to go to get it done.  And Sheriff Ashley was
10  leaving the parking lot, and he stopped to talk to Jason.
11  I don't know about what.  I didn't ask.  And he got out of
12  his car and asked me what I needed, and I told him, and he
13  said, just go in the back, they will help me take care of
14  what I needed.
15      Q.  Okay.  And from what I gathered from our talk
16  today, neither one of you -- neither you nor Sheriff
17  Ashley have really had a cross word with each other.
18      A.  No, sir.
19      Q.  Okay.  In fact, after your vehicle was searched,
20  didn't he walk back up and shake your hand?
21      A.  No, sir, I don't recall him shaking my hand.
22      Q.  You don't recall him shaking your hand?
23      A.  No.
24      Q.  Okay.  Have you ever been convicted of a felony
25  or crime of dishonesty?

Page 99

1      A.  No, sir.
2      Q.  Okay.  I ask everybody that.
3      A.  Okay.
4      Q.  Not picking on you.
5      A.  No, sir.
6      Q.  Is there anything about the incident that we
7  haven't talked about that stands out in your mind?
8      A.  No, sir.  I think we covered everything as far
9  as I can recall.
10      Q.  Okay.
11          MR. ALLEN:  Any questions, Mr. Waide?
12          MR. WAIDE:  No.
13          THE WITNESS:  All right.
14          THE REPORTER:  Do you want a copy, Mr. Waide?
15          MR. WAIDE:  Yes.
16          (Exhibit 2 marked for identification and
17  attached hereto.)
18          (Deposition concluded at 11:00 a.m.)
19
20
21
22
23
24
25

Page 100

1                  CERTIFICATE OF DEPONENT
2          I, Michael Jordan, deponent in this deposition,
3  hereby certify that I have examined the foregoing 99 pages
4  and find them to contain a full, true, and accurate
5  transcription of the testimony as given by me on February
6  17, 2017, in Waynesboro, Mississippi.
7  Page   Line          Correction (If Any)
8      _____  _____  _____
9      _____  _____  _____
10     _____  _____  _____
11     _____  _____  _____
12     _____  _____  _____
13     _____  _____  _____
14     _____  _____  _____
15          This the _____ day of _____, 2017.
16
17     _____
18                  MICHAEL JORDAN
19  State of Mississippi
20  County of _____
21  Sworn to and subscribed before me, this the ___ ____ day
22  of _____, 2017.
23
24                  NOTARY PUBLIC
25  MY COMMISSION EXPIRES _____

Page 101

1                  CERTIFICATE OF COURT REPORTER
2          I, Kelly D. Brentz, Court Reporter and Notary
3  Public in and for the County of Madison, State of
4  Mississippi, do hereby certify that the foregoing 99
5  pages, and including this page, contain a true and
6  accurate transcription of the testimony of Michael Jordan,
7  as taken by me in the aforementioned matter at the time
8  and place heretofore stated, by stenotype and later
9  reduced to typewritten form under my supervision by means
10  of computer-aided transcription.
11          I further certify that under the authority
12  vested in me by the State of Mississippi that the witness
13  was placed under oath by me to truthfully answer all
14  questions in this matter.
15          I further certify that I am not in the employ of
16  or related to any counsel or party in this matter and have
17  no interest, monetary or otherwise, in the final outcome
18  of this proceeding.
19          Witness my signature and seal this the 28th day
20  of February 2017.
21
22
23          _____
24          KELLY D. BRENTZ, CSR #1518
25  My Commission Expires:  February 1, 2019