### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### EASTERN DIVISION

**MICHAEL JORDAN**                                        **PLAINTIFF**

**V.**                         **CIVIL ACTION NO. 2:16-CV-70-KS-MTP**

**WAYNE COUNTY, MISSISSIPPI AND**
**SHERIFF JODY ASHLEY IN HIS INDIVIDUAL**
**AND OFFICIAL CAPACITY**                                 **DEFENDANTS**


#### ORAL DEPOSITION OF JODY ASHLEY


Taken at the instance of the Plaintiff on Friday,
February 17, 2017, in the Wayne County Sheriff's
Department, 613 Court Street, Waynesboro, Mississippi,
beginning at 11:05 a.m.


(Appearances noted herein)

EXHIBIT

tabbies

13


REPORTED BY:     Kelly D. Brentz, CSR, RPR
                 Edwards Reporting, Inc.
                 435 Katherine Drive, Suite A
                 Jackson, Mississippi 39232
                 601-355-DEPO (3376)
                 800-705-DEPO (3376)

Michael Jordan v.                                                      Jody Ashley
Wayne County, Mississippi, et al.                          February 17, 2017

---

**Page 2**

```
 1              APPEARANCES:
 2
 3
 4    DANIEL M. WAIDE, ESQ.
      Johnson, Ratliff & Waide, PLLC
 5    1300 Hardy Street
      Hattiesburg, Mississippi 39401
 6
 7           COUNSEL FOR PLAINTIFF
 8
 9
10
11    WILLIAM R. ALLEN, ESQ.
      Allen, Allen, Breeland & Allen, PLLC
11    214 Justice Street
12    Brookhaven, Mississippi 39602
13
           COUNSEL FOR DEFENDANTS
14
15
16
17
18
19  ALSO PRESENT:   Tommy Jackson
                    Michael Jordan
20
21
22
23
24
25
```

**Page 3**

```
 1                    INDEX
 2    Style and Appearances........................  1
 3    Index........................................  3
 4    Examination by Mr. Waide.....................  4
 5    Certificate of Deponent......................  29
 6    Certificate of Reporter......................  30
```

**Page 4**

1              JODY ASHLEY,
2    having first been duly sworn, was examined and
3    testified as follows, to-wit:
4  EXAMINATION BY MR. WAIDE:
5    Q.  Sheriff, how are you this morning?
6    A.  Good morning, sir.
7    Q.  Would you just give your name for the record,
8  please, sir?
9    A.  Jody Ashley.
10   Q.  Okay.  Mr. Ashley, I know it's pretty obvious
11 what you do, but will you tell the record what you do for
12 a living?
13   A.  Sheriff of Wayne County.
14   Q.  Okay.  How long have you been sheriff?
15   A.  This is the first term.
16   Q.  First term.  When did you start in office,
17 though?
18   A.  It was last year.
19   Q.  Okay.
20   A.  January.
21   Q.  And prior to being sheriff, what did you do?
22   A.  I was a State game warden.
23   Q.  Okay.  This is your first public office?
24   A.  Right.
25   Q.  Okay.  Have you done anything -- let me ask you

**Page 5**

1  this, have you ever given a deposition before?
2    A.  Years ago, my agency was involved in something
3  with some alligator heads.  It was 15, 17 years ago.
4  It's --
5    Q.  Okay.  Well, you sat through Mr. Jordan's so you
6  know kind of how it goes.
7    A.  Yes, sir.
8    Q.  Just one thing I always like to make sure with
9  everybody, just remember we don't talk over each other, no
10 head nods, no "uh-huhs" and "huh-uhs," those sorts of
11 things.  Now, have you taken any drugs or alcohol today
12 that would impair your ability to give --
13   A.  No, I have got some sinus medicine -- I think
14 everybody's had this crud.  I'm back taking some, you
15 know, medicine trying to get this -- rid of this stuff.
16 Other than that, that's it.
17       MR. ALLEN:  Let him get his question fully out.
18 I know it's difficult.
19   Q.  (By Mr. Waide) It's difficult, yeah.  Now, is
20 there any reason you couldn't give a truthful deposition
21 today?
22   A.  No.
23   Q.  All right.  Now, have you reviewed any documents
24 in preparation for today?
25   A.  Yes.

Page 6

1   Q.   Okay. What did you look at?
2   A.   What my attorneys had.
3   Q.   Okay. Is that just stuff that's been filed?
4   A.   Right, that's it.
5   Q.   Have you looked at anything beyond what's been
6   produced or filed?
7   A.   No.
8   Q.   Okay. Have you talked with anybody besides your
9   attorney getting ready for today?
10  A.   No.
11  Q.   All right. All right. Now, when you ran for
12  sheriff, do you recall going to Mr. Jordan's office just,
13  you know, asking for support from various people?
14  A.   Right.
15  Q.   Okay. And did you ever go to Mr. Jordan and
16  say, "Hey, would you support me?"
17  A.   We had a conversation on the phone, yes.
18  Q.   Okay. And the way I understand it is he was
19  friends with Sheriff Woodson and he just said, "I have got
20  a friend running. I can't support you, but I would if not
21  for him"?
22  A.   No, he said he could support me, you know. He
23  said he didn't have a problem with that. But he -- you
24  know, he had heard he was not going to run, so that was --
25  that's basically it.

Page 7

1   Q.   Okay.
2   A.   And I saw some people into the shop and asked
3   for their support, too. I asked everybody to support me.
4   Q.   Okay. But I guess just -- I want to be clear.
5   When you had the conversation, was it your understanding
6   that he was or was not going to support you?
7   A.   I was understanding that he said he would
8   support me, you know. He said that Sheriff Woodson was
9   his friend but he was under the impression he wasn't
10  running.
11  Q.   Okay.
12  A.   It was all over town.
13  Q.   And then Sheriff Woodson did decide to run,
14  though; right?
15  A.   Yeah, in the end, he did.
16  Q.   Okay. And then Mr. Jordan supported Sheriff
17  Woodson?
18  A.   Yes, sir.
19  Q.   So during the election itself, though, you were
20  aware Mr. Jordan supported Sheriff Woodson?
21  A.   Yes, sir.
22  Q.   Okay. Now, did it bother you at all that
23  Mr. Jordan had said he could support you and then he
24  didn't?
25  A.   No, that's elections.

Page 8

1   Q.   Okay. Now, let's see, just a few people -- I
2   will ask you just a couple of questions. You heard
3   Mr. Jordan talk about a few people. Do you know -- or did
4   you know Wayne Holifield?
5   A.   I sure did. He's on my wrecker rotation -- was
6   on my wrecker rotation.
7   Q.   Okay. And did you ever say anything to
8   Mr. Holifield about him not supporting you in the
9   election?
10  A.   No. I mean, Mr. Holifield would be at the
11  coffee shops. I think it was a joke we laughed about one
12  time. He came out on this large -- largest drug bust in
13  state history and said, "I'm worried about you with these
14  drug dealers that you're up against," and I kept him on
15  the wrecker rotation. He got real sick. He came into my
16  office just before he passed away and said, "I can't be 24
17  hours a day, Jody. I can only be" -- you know, so there
18  was no problem with me and him.
19  Q.   Okay. All right. What about -- did you ever
20  tell Chris Huntley to take his Woodson signs down?
21  A.   I don't remember. I don't remember even
22  seeing -- I don't know Chris Huntley.
23  Q.   Okay. Well, do you remember going to a car wash
24  and telling whoever was there they needed to take --
25  A.   The only car wash I went to was -- was Andrew

Page 9

1   Chapman's car wash.
2   Q.   Okay. Did you ever have -- did you ever tell
3   Jane Hutto anything to the effect of "to go to hell," "to
4   burn in hell," or anything along those lines?
5   A.   I told her -- her son -- her nephew had broke
6   into my mom's shop and that -- you know, she had called
7   the sheriff's department and said that his name was
8   flashed across the news, and I said, "That's the way it's
9   going to be and he's going to jail."
10  Q.   Okay. Did you ever make any of those kinds of
11  comments like you heard Mr. Jordan talk about, though, to
12  Ms. Hutto?
13  A.   I just said that, you know, that -- what I said
14  was that he's going to jail and he's on News 7. She was
15  upset about it, and that's what I said.
16  Q.   Okay. Now, when you worked for -- what was your
17  position when you worked for the State?
18  A.   I was a conservation officer.
19  Q.   I mean, but like did you have a title like
20  sergeant or --
21  A.   I was a master sergeant.
22  Q.   Master sergeant, okay. And as a -- working as a
23  conservation officer, do you have any patrol duties
24  similar to what you do as a sheriff?
25  A.   We had a lot of duties. We did wildlife and

Michael Jordan v.
Wayne County, Mississippi, et al.

Jody Ashley
February 17, 2017

Page 10

1 stuff like that, assisted the FBI, DEA, whatever they
2 needed. We did some things like that.
3    Q. Okay. All right. With traffic stops and – I'm
4 vaguely familiar with what you do with conservation and
5 wildlife, all those sorts of things. Were you – were you
6 aware what – the rules regarding traffic stops, what the
7 federal constitutional rules, those sorts of things, are?
8    A. Correct.
9    Q. Okay. And had you been trained in those things
10 when you worked for the State?
11    A. Highly trained.
12    Q. Okay. Now, with the sheriff's department,
13 what's the – and I know everybody sheriff's department is
14 different. That's why I'm trying to ascertain how your
15 department works. When there is a traffic stop, what
16 are – how do you handle – is there a – do you radio in,
17 say, "Initiating stop," and -- is there a record kept?
18 How does that work with the sheriff's department?
19    A. There's a CAD system –
20    Q. Okay.
21    A. -- on it. And then, you know, on a stop, you go
22 through your procedures where you're protecting yourself
23 and weapons or anything else.
24    Q. Let me stop you real quick. I'm not talking
25 about the stop itself, just the system and the records

Page 11

1 that are kept. When you -- when you initiate a stop and
2 you radio in that you're initiating a stop, I know some
3 departments, when there's a stop being initiated, you
4 know, they will have a – they have all kind of different
5 codes, but it will say this -- radio this time on arrival,
6 time to – cleared, time departed, those sorts of things.
7 Do y'all have those sorts of things in place?
8    A. Well, I'm not clear what you're trying to ask.
9 I know when you turn your blue lights on and you're making
10 a stop, you're worried about your safety.
11    Q. Right.
12    A. Then, you know, if you have got something, then
13 you radio in and everything, so that's basically what we
14 go through is officer safety.
15    Q. But let me -- is there a --
16    A. There is a recording device here for running
17 tags and everything else at -- it's called the CAD system.
18    Q. Right. But is there a record kept of -- what's
19 your call number?
20    A. Wayne 1.
21    Q. Wayne 1. Is there any system here in Wayne
22 County that says, "Wayne 1, time on arrival," to where you
23 can look at a printout that says, "Wayne 1 reported he
24 arrived at this time"; do y'all have that kind of record
25 system?

Page 12

1    A. We've got a CAD system, but let me explain
2 something to you --
3    Q. Okay.
4    A. -- about what's took place. The 911 system went
5 down. I went back to the board of supervisors. We
6 were -- we -- they have had all kind of problems because
7 it's in a double-wide trailer. It's not grounded.
8 We're -- we were down four or five weeks ago. And I went
9 back to the board of supervisors and explained to them
10 this system -- we need to get into a sound building, and
11 every time lightning pops or comes in, we could be back
12 out. It's not a system that's been sound the whole time.
13    Q. Okay.
14    A. You can contact the 911 center, Angel Axon, and
15 ask her how many times has this system been down.
16    Q. Let me just ask you, is there any record that
17 just shows what time you arrived at the stop of Mr. Jordan
18 and then what time Mr. Mozingo and what time anybody else
19 would have arrived?
20    A. I believe there is something on the CAD. I
21 think we have got something like that or –
22    MR. ALLEN: (Shook head.)
23    THE WITNESS: Okay. I'm not sure. I thought
24 something was there – that Mozingo or somebody –
25    MR. ALLEN: No.

Page 13

1    THE WITNESS: Okay.
2    MR. WAIDE: Okay. All right.
3    MR. ALLEN: I don't have it, and I have been
4 given everything that's on our system, so I -- that's
5 what Ms. Bishop has told me and she's the head of it.
6    THE WITNESS: Okay. I will let him ask Mike
7 that because --
8    MR. ALLEN: Yeah, Mike might know.
9    A. Mike was right there, I think, that –
10    Q. (By Mr. Waide) Okay. Now, when you initiated
11 the -- well, just walk me through what the -- for Wayne
12 County, when initiating a traffic stop such as in this
13 instance with Mr. Jordan, what's the proper procedure?
14    A. You know, initiating just a stop --
15    Q. Yes.
16    A. -- is what you're -- you know, you turn your
17 blue lights on, you know, and then when the subject pulls
18 over, you approach the vehicle, and that's basically what
19 we do on traffic stops.
20    Q. Okay. And where does the radio come into play
21 when you do a stop?
22    A. Well, the radio comes into play if you're
23 running a tag or a driver's license or things like that.
24 That's where it comes into play. And plus, like I'm going
25 to walk you back through again, I know you haven't been in

Page 14

1  law enforcement, it's officer safety that comes first.
2  Q.  Right.
3  A.  That's what goes with me.
4  Q.  When you initiate a stop, though, I guess my
5  biggest question is, do you call in every time you do a
6  stop, say, "Wayne 1 stopping vehicle," and call in what
7  the vehicle looks like before you approach?
8  A.  It's not that you call in when you're stopping
9  one.
10  Q.  Okay.
11  A.  It's when you get out or how long you're going
12  to be or -- you know.
13  Q.  Okay.
14  A.  That's -- that's the issue there, you know,
15  because if you call in on every vehicle that's stopped,
16  "I'm stopping this vehicle," no, they're not -- it's
17  not --
18  Q.  That's my -- that was --
19  A.  It would be a pile of them.  You would be on
20  that -- I guess on the system.
21  Q.  That's my question, because every department
22  does it a little differently so I just wanted --
23  A.  I understand, yes, sir.
24  Q.  -- to know how you did it.  All right.  So just
25  when you first initiated your blue lights on Mr. Jordan,

Page 15

1  do you recall whether or not you immediately called in or
2  do you recall how you did that?
3  A.  I don't remember other than, you know, turning
4  the blue lights on.
5  Q.  Okay.
6  A.  And pulling Mr. Jordan over.
7  Q.  And do you agree with what Mr. Jordan says, that
8  you were at the stop sign on Court Street when he passed
9  in -- that intersection on Azalea?
10  A.  Me and -- yes, me and -- Brother Steve Smith was
11  a passenger -- was at the Court Street.
12  Q.  Okay.  Was he along a ride-along or something?
13  A.  Yes, he rides along, the preacher does, a lot of
14  times.  We were actually going out to do a safety
15  checkpoint.
16  Q.  Okay.  Where were you headed to?
17  A.  84 -- 84 West.
18  Q.  Okay.  So you were going out that direction
19  anyway?
20  A.  Right.
21  Q.  Okay.  And does the preacher -- when you go to a
22  safety checkpoint, do you usually have civilians with you?
23  A.  Well, we have a word of prayer, he goes out
24  and -- that's the way we do it here.
25  Q.  Okay.  Now, when you have a civilian ride-along,

Page 16

1  does your insurance or anybody require you to keep any
2  record of who's riding when?
3  A.  No.
4  Q.  Okay.  Do you know if your insurance may require
5  those sorts of things?
6  A.  Well, I can -- know as the sheriff here, I can
7  have a ride-along.
8  Q.  Well, I know that.
9  A.  I mean, that's -- I don't check with insurance
10  companies, but that's -- you know, that's -- the preacher
11  comes in here and prays and, you know, he goes out with us
12  several times.  He's been out, I bet you, 50 times with
13  me.
14  Q.  Okay.  All right.  Now, when -- when you pulled
15  out at the stop sign there off of Court Street onto
16  Azalea, how long was it before you turned on your blue
17  lights and pulled over Mr. Jordan?  Do you remember?
18  A.  I don't know how long it was.  I just, you know,
19  observed him crossing the center line.  That's the reason
20  I pulled him over.
21  Q.  Okay.  Now, when you observed him cross the
22  center line, do you recall what the reverend was doing?
23  A.  No, I'm driving, so I'm focused on what I'm
24  doing.
25  Q.  Were y'all talking at the time?

Page 17

1  A.  No.
2  Q.  All right.  Did you tell him you were going to
3  pull his -- you were going to pull the truck over for
4  swerving?
5  A.  No, no, that's -- you know, when you're in a
6  vehicle and you're driving, you're observing what you're
7  doing, that's -- you know, I'm sure when I came back to
8  the vehicle, I had talked to him for a few minutes, but
9  that was -- other than that, I was -- I was, you know,
10  driving.
11  Q.  Okay.  And your reason, as I understand it, for
12  stopping Mr. Jordan was -- you say you observed him
13  crossing the center line; is that right?
14  A.  Right.
15  Q.  Okay.  I know that could obviously mean a lot.
16  When you say "crossing the center line," are we talking
17  whole vehicle over the line?  Are we talking a wheel over
18  the line?
19  A.  We're talking swerving, careless driving.
20  Q.  Okay, careless driving.
21      (Pause.)
22  Q.  Now, I believe Mr. Jordan said it was somewhere
23  around that auto shop where he started to pull over on
24  Azalea.  Does that -- is that about right -- what you
25  remember?

Michael Jordan v.
Wayne County, Mississippi, et al.

Jody Ashley
February 17, 2017

Page 18

1   A.  I'm not familiar with the auto shop.  I don't
2   know what those businesses are right there.  I don't --
3   Q.  Let me see if I wrote it down.  Do you remember
4   what Mr. Jordan's truck looked like?
5   A.  I think it was brown or -- I'm not sure on the
6   color.
7   Q.  Okay.  Now, during the traffic stop, from the
8   time you initiated blue lights to the time you pull up at
9   Mr. Jordan's shop, at what point did you radio in so that
10  other deputies knew that you would be there to show up?
11  A.  Well, there was other deputies that was in
12  behind us going to the safety checkpoint.
13  Q.  Okay.  So you already had a couple that were
14  going with you to a check stop -- or a checkpoint?
15  A.  Yes.
16  Q.  All right.  Would that have included the
17  narcotics guy?
18  A.  Yes.
19  Q.  Okay.  And Mike Mozingo was also in tow, I
20  guess?
21  A.  Yes.
22  Q.  All right.  And this -- Ms. Courtney, was she
23  also in tow?
24  A.  She works for the police department.  I don't --
25  like he stated, she just showed up.  I don't know.

Page 19

1   Q.  Okay.  Had you been on the radio at all saying
2   that y'all were involved in a stop, for her to -- for her
3   just to know to show up?
4   A.  No, I think what, you know, I remember is we got
5   to his shop because I -- he kept on going until he got to
6   his gate was that -- that's when the radio contact was.
7   Q.  Okay.
8   A.  You will have to ask Mozingo that.
9   Q.  Okay.  Now, at what point did you realize that
10  it was Mr. Jordan?
11  A.  When I got his driver's license.
12  Q.  Okay.  Did you know -- I mean, before he handed
13  it to you, did you know it was him, though?
14  A.  No.
15  Q.  Okay.  Had you ever met Mr. Jordan before?
16  A.  Yes.
17  Q.  Okay.  You just didn't recognize him when you
18  first approached?
19  A.  I didn't recognize him in the truck.
20  Q.  Okay.  I mean, once he got -- I'm talking about
21  between the time you stopped him and you asked for his
22  license until he handed it to you, did you know it was
23  him?
24  A.  He told me who he was, yes.
25  Q.  Okay.

Page 20

1   A.  He said I should know him.
2   Q.  Okay.  Now, did you ever run his tag?
3   A.  I'm not sure if we did or not.  I would have to
4   go back and look or -- I didn't know it was expired.
5   Q.  Okay.  And, I mean, do you even know if it was
6   expired or not other than what somebody may have told you?
7   A.  That's what I was told, but, I mean, I don't
8   know about that.  I didn't pull him over for that.
9   Q.  Okay.  Why did you make the decision not to
10  ticket him for careless driving?
11  A.  Well, I mean, you can give a verbal warning and
12  you can, you know, warn somebody and plus, you know, we
13  shook hands afterwards, so...
14  Q.  Okay.
15  A.  If you go back and look, I haven't given a
16  citation since I have been sheriff.
17  Q.  Okay.
18  A.  I don't have a ticket book.
19  Q.  All right.  Let me ask you, if you don't carry a
20  ticket book, why would you stop somebody for careless
21  driving?
22  A.  Well, I mean, safety of the road.  Your kids
23  could be in the car, too, coming down the road.
24  Q.  All right.  Now, at what point did you make the
25  decision that you wanted to search the truck?

Page 21

1   A.  Let's see, I believe I got his driver's license,
2   went back, met Johnny Smith --
3   Q.  Is that the narcotics agent?
4   A.  Yes, gave the driver's license to him.
5   Q.  I keep saying "agent."  Is he a deputy?
6   A.  No, he's a narcotic agent.
7   Q.  Okay.  All right.  And I hated to interrupt you
8   there but I just wanted to be clear on who Johnny Smith
9   was.  At what point did you decide that y'all wanted to
10  search the truck?
11  A.  Within -- it was within a few minutes.
12  Q.  Okay.  And why was that determination made?
13  A.  Check for any weapons or anything that would
14  hurt us.
15  Q.  And why would you do that?
16  A.  Just for safety -- officer safety.
17  Q.  Okay.
18  A.  Rules of the road.
19  Q.  I understand that.  Mr. Jordan was out of the
20  truck at this time, though; correct?
21  A.  I think he went back to his back bumper.  I
22  think that's where he was at.
23  Q.  Okay.  But if he's not in his truck, even if
24  there were weapons in the truck, there would be no danger
25  to officers; is that right?

Michael Jordan v.
Wayne County, Mississippi, et al.

Jody Ashley
February 17, 2017

Page 22

1    A.  No, still -- if there's something there, sir, go
2  back and look at the video, yes, sir.
3    Q.  There's a video of this stop?
4    A.  No, I'm talking about go back and look where
5  officers have been killed.
6    Q.  I understand that.  But this is one situation.
7    A.  I understand that, too.
8    Q.  Now, when you -- so you're saying you made the
9  search of the truck for officer safety purposes?
10   A.  I didn't make the search, sir.  I --
11   Q.  Your department did?
12   A.  Right.
13   Q.  The decision -- as I understand it, you're
14 saying the decision to search the truck was made to search
15 for weapons for officer safety?
16   A.  Right.
17   Q.  Okay.  Was -- and why was there a concern for
18 officer safety?
19   A.  There is a lot of concern for officer safety
20 when you stop vehicles, sir.
21   Q.  Okay.  And at this point, you knew you were
22 dealing with Mr. Jordan; right?
23   A.  When I got his driver's license, yes.
24   Q.  And you knew you were at his place of business;
25 is that right?

Page 23

1    A.  Correct.
2    Q.  Okay.  And how many officers were there at this
3  time?
4    A.  Let's see, the chief deputy, myself, and Johnny
5  Smith.
6    Q.  Okay.
7    A.  And then Courtney showed up later.
8    Q.  Okay.  All right.  And Mr. Jordan, at the time
9  the decision was made to search his truck, was at his back
10 bumper?
11   A.  He had came back to his back bumper.
12   Q.  Okay.  Is that when you told him y'all needed to
13 search his truck?
14   A.  Asked for permission to search the truck.
15   Q.  Okay.  And what did he tell you at that time?
16   A.  He gave permission but he wanted to know why,
17 and then I gave -- Johnny Smith's the one that searched
18 his vehicle.  I went back to my patrol car.
19   Q.  Okay.  Did you ever threaten to arrest
20 Mr. Jordan if he wouldn't let him search his truck?
21   A.  No, I did not.
22   Q.  Okay.
23   A.  I don't -- what you do -- when you ask for
24 permission -- you can't search a vehicle unless you get
25 permission.  He gave verbal permission.

Page 24

1    Q.  Okay.  Did you ever insinuate he could go to
2  jail for refusing to let you search the truck?
3    A.  No.  I said you can go to jail over citations
4  and stuff like that.  He was real disgruntled but -- I
5  mean, if you stop people, sometimes people do get
6  disgruntled.
7    Q.  Okay.  All right.  So you told him that he could
8  go to jail over citations?
9    A.  Yes, over the -- what we call careless driving.
10   Q.  Right.
11   A.  Which would be a misdemeanor.  It's not a
12 felony.
13   Q.  Have you ever taken somebody to jail for
14 careless driving alone without any other charges or
15 citations?
16   A.  I have arrested people for misdemeanors.  I've
17 been 27 years as a State officer.  Yes, I've arrested
18 people for misdemeanors.
19   Q.  I understand that.  There's different classes of
20 misdemeanors, though.  Have you ever cited someone and
21 taken them to jail for careless driving only without any
22 other charges against them?
23   A.  I would have to go back and look.  I have
24 arrested so many people, I can't remember.
25   Q.  Okay.

Page 25

1         MR. ALLEN:  To the best of your knowledge,
2    though, is what he needs to know today.
3    Q.  (By Mr. Waide)  Right.
4    A.  I guess.  I would have to go back and look.
5    Q.  As you sit here today, you don't know the
6  correct -- whether you have or not solely for --
7    A.  I have arrested so many people, sir, through my
8  career, I'm sure, from DUIs to everything.
9         MR. ALLEN:  But you need to answer his question.
10   As you sit here today, you don't know if you have
11   done that; is that what you're saying?
12   A.  I said I can't -- on that type citation, no.
13   Q.  (By Mr. Waide)  Okay.
14        (Pause.)
15   Q.  Has anyone ever told you that they believed
16 Mr. Jordan deals drugs?
17   A.  No.
18   Q.  None of the deputies have expressed a concern to
19 you about Mr. Jordan having some other sources of income
20 besides legitimate businesses?
21   A.  No, he worked for the Kelley Brothers.  They
22 think highly of him.  Tommy Kelley thinks the world of
23 him.
24   Q.  Okay.  Why did the narcotics agent -- you said
25 the narcotics agent did the --

Michael Jordan v.
Wayne County, Mississippi, et al.

Jody Ashley
February 17, 2017

---

Page 26

1    A. He was going to the safety checkpoint.
2    Q. I understand that. That wasn't my -- what I was
3 going to ask. Be sure I finish so we just get the right
4 part out.
5       Why was the narcotics agent the one who did the
6 search?
7    A. Because Mr. Jordan was disgruntled. I didn't --
8 I was going to let the narcotics check his vehicle where
9 he wouldn't get mad at me doing it.
10   Q. Okay. Did anybody else assist the narcotic
11 agent in the search of the truck?
12   A. I don't remember. I remember a floor mat blew
13 out and I saw Johnny pick up a floor mat from -- I think
14 he had his vehicle cleaned or something. That's all I
15 remember.
16   Q. Okay. Now, the Wayne County Sheriff's
17 Department does have a consent form that you have
18 available for vehicle searches; right?
19   A. We have a -- yes.
20   Q. Okay. Do you carry any of those in your
21 vehicle?
22   A. I'm sure we do, yeah.
23   Q. So --
24       MR. ALLEN: Your vehicle.
25       THE WITNESS: My vehicle?

---

Page 27

1    A. Mike and them do. I'm pretty sure I do. I have
2 got a file back in the back of my car with all kinds of
3 stuff.
4    Q. (By Mr. Waide) And did y'all have Mr. Jordan
5 fill out and sign a consent form?
6    A. No, we got permission -- verbal permission to
7 search his vehicle.
8    Q. Okay.
9    A. He gave consent.
10   Q. Under the -- so why didn't you also get the
11 consent form just for your paperwork purposes?
12   A. I just -- we just got verbal permission.
13       (Pause.)
14       MR. WAIDE: Give me a second to talk to
15 Mr. Jordan. Let's step out for just a second.
16       (Pause.)
17   Q. (By Mr. Waide) Just maybe one or two more.
18 Don't -- do you know -- and I venture to guess you may
19 not, but if you do, do you know the -- any idea what the
20 breakdown of arrests are for Wayne County for certain
21 crimes? Do you know what your numbers are?
22   A. For?
23   Q. For instance, do you know how many people are
24 jailed each month on careless driving charges?
25   A. I would have to look at the jail docket.

---

Page 28

1    Q. Okay. I figured you may not know. That's
2 why --
3    A. No, sir, I don't know.
4    Q. I was just curious. Okay.
5       MR. WAIDE: That's all I have.
6       MR. ALLEN: I don't have anything.
7       (Deposition concluded at 11:35 a.m.)

---

Page 29

CERTIFICATE OF DEPONENT

    I, Jody Ashley, deponent in this deposition,
hereby certify that I have examined the foregoing 28 pages
and find them to contain a full, true, and accurate
transcription of the testimony as given by me on February
17, 2017, in Waynesboro, Mississippi.

Page   Line         Correction (If Any)

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

_____  _____   _____

    This the _____ day of _____, 2017.

_____
        JODY ASHLEY

State of Mississippi
County of _____
Sworn to and subscribed before me, this the _____ day
of _____, 2017.

_____
        NOTARY PUBLIC
MY COMMISSION EXPIRES _____